James J. LAWLOR, et al., Appellants,

v.

**DISTRICT OF COLUMBIA, Appellee.**

Roy Littlejohn, et al., Appellants,

v.

James J. Lawlor, et al., Appellees.

Nos. 98–CV–797, 98–CV–963.

District of Columbia Court of Appeals.

Argued Nov. 16, 1999.
Decided Sept. 7, 2000.

Paul H. Zukerberg, for appellants/cross-appellees James J. Lawlor, et al.

Craig Ellis, for Roy Littlejohn, Robin Littlejohn, and Marilyn A. Littlejohn, appellants in No. 98–CV–963.

James C. McKay, Jr., Assistant Corporation Counsel, with whom Jo Anne Robinson, Interim Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellee the District of Columbia.

Before WAGNER, Chief Judge, and TERRY and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

At all times relevant to these appeals, the J.B. Johnson Nursing Home, a long-term care facility owned by the District of Columbia, housed 244 residents in need of intensive nursing care. In the mid–1980's, the District awarded a multi-million dollar contract for its day-to-day management and operation to Urban Shelters & Healthcare, Inc. (Urban Shelters), a private corporation of which Roy Littlejohn owned all of the stock. Mr. Littlejohn's wife, Marilyn A. Littlejohn, served on Urban Shelters' Board of Directors and was the corporation's Secretary/Treasurer.

In 1995, the Internal Revenue Service (IRS) placed a lien on Urban Shelters' assets and instituted proceedings to collect more than $1,400,000 in unpaid withholding taxes. During the financial emergency that ensued, employees of the Home began to receive paychecks from Valrob, Inc., a corporation which was managed by Roy Littlejohn and of which Roy Littlejohn's daughter, Robin Littlejohn, owned all of the stock. As a result of the Home's unfavorable financial condition, 297 employees received no compensation for work that they performed between October 25 and November 18, 1995. For a brief period, the District government took over the operation of the Home. The Home then came under new management, but the employees have not been compensated for their services during that three and a half week period.

On April 1, 1996, James Lawlor and several other employees sued Urban Shelters, Valrob, and Roy, Robin, and Marilyn A. Littlejohn for unpaid wages and benefits. Shortly thereafter, on May 20, 1996, the employees intervened as plaintiffs in a suit brought by Urban Shelters against the District of Columbia for breach of contract. The employees alleged, *inter alia*, that they were known third-party beneficiaries to the contract between Urban Shelters and the District. The employees further claimed that high-ranking officials of the District had orally promised "that payments to the contractor would be made in timely fashion so that the employees could get paid," that this oral promise constituted an enforceable contract, and that the District was liable to the employees on a *"quantum meruit"* theory.[1] The cases were consolidated for trial.

---

1. The employees' complaint also included counts of "fraud" and "fraud in the inducement" against the District. The "fraud" count was based on a claim that the District participated in certain allegedly fraudulent practices by Urban Shelters and the Littlejohns vis-a-vis the employees. See pp. [13]-[14], *infra*. The "fraud in the inducement

claim" was based on the allegation that District officials induced the employees to stay on the job by knowingly making false promises that the employees would be paid. In their brief in this court, however, the employees have stated, in countering arguments by the District based on D.C.Code § 12–309 (1995), that their claims are for "breach of

On April 10, 1998, shortly before the trial was scheduled to begin, the motions judge, Honorable Judith E. Retchin, dismissed the case against the District on the ground, *inter alia*, that the Contract Appeals Board (CAB) had primary jurisdiction over the contract claim. Following a bench trial on the employees' claims against Roy, Marilyn A. and Robin Littlejohn, Urban Shelters, and Valrob,[2] the trial judge, Honorable José M. López, held that each of the individual defendants was liable to the plaintiffs in his or her capacity as a corporate officer, for unpaid wages and other relief. The judge further concluded that the corporate veils both of Valrob and of Urban Shelters must be pierced, and that Roy and Robin Littlejohn were therefore liable as stockholders for the obligations of the corporations. Finally, the judge held that Urban Shelters and Valrob, as well as all three individual defendants, were liable to the employees for violating the District's Wage Payment Law. D.C.Code § 36–108 (1997). The judge entered judgment against all of the defendants, jointly and severally, in the amount of $1,447,651.99.

In these consolidated appeals, the employees argue in No. 98–CV–963 that the motions judge erred in dismissing their claims against the District because, according to the employees, the Superior Court, and not the CAB, had jurisdiction over the employees' claim that the District had breached an oral contract. The Littlejohns appeal in No. 98–CV–797 from the trial judge's decision holding them individually liable to the employees. The Littlejohns argue that the record does not support the piercing of the corporate veil of either corporation, and that the judge erred as a matter of law by holding Roy,

Robin, and Marilyn A. Littlejohn personally liable for their alleged conduct as corporate officers.

We reverse the judgment against Marilyn A. Littlejohn. In all other respects, we affirm.

## I.

### A. *Background.*

Urban Shelters' relationship with the District began when the corporation was awarded a contract to operate the J.B. Johnson Nursing Home in 1984.[3] In 1990 and 1991, the contract was renegotiated after the District had entertained competitive bids. The new contract provided that Urban Shelters would continue to operate the Home for one year, and the District was authorized to renew the agreement pursuant to four one-year options. At the end of the first year, however, the District did not exercise its one-year renewal option, but instead began a practice of extending the contract for various shorter periods.[4] In its complaint against the District, Urban Shelters alleged that these sporadic extensions made the status of its relationship with the District unclear, and that its precarious financial situation was compounded by the District's failure to make timely payments to Urban Shelters of money due under the contract.

In 1992, Urban Shelters began to experience difficulty both in paying its employees and in meeting its payroll tax obligations. In an unorthodox attempt to resolve its cash flow problems, the corporation discontinued the payment of federal and state withholding taxes. As the trial judge found, Urban Shelters continued to deduct withholding taxes from its

contract and *quantum meruit*" and that they "have nothing to do with tort."

2. Because Urban Shelters consented to judgment in favor of the employees, its liability was not contested at trial.

3. Some historical background information about the relationship between Urban Shel-

ters and the District is not found in the evidentiary record, but has been cobbled together from the parties' pleadings.

4. Roy Littlejohn testified that these extensions would sometimes last for months and at other times would last for as little as three days.

employees' paychecks. In fact, the employees' W–2 forms reflected the withholding of taxes which, in reality, were never paid to the appropriate taxing authority. As Urban Shelters' tax arrearage grew, and as each unpaid tax bill accumulated penalties and interest, the company's problems inevitably snowballed until the situation careened out of control.

Urban Shelters' financial house of cards had been constructed on a foundation of unpaid taxes, and in 1995 it began to crumble. In February of that year, the IRS served Roy Littlejohn with a Notice of Tax Levy for more than $1,400,000 in unpaid withholding taxes.[5] The IRS placed a lien on Urban Shelters' assets. Payments due to Urban Shelters under the corporation's contract with the District were assets subject to the lien. Urban Shelters had also failed to pay withholding taxes due to the District of Columbia and to other taxing authorities. The trial judge found that, in all, Urban Shelters owed almost $2,000,000 in unpaid taxes. Once the lien had been placed on its assets, Urban Shelters lacked the resources both to care for the residents of the Home and, at the same time, to pay its employees. Care for the residents thus continued, but the employees were not paid.

In an effort to salvage the operation, Roy Littlejohn contacted representatives of the District and suggested that the J.B. Johnson contract be "novated." He proposed that another corporation which he controlled, Metropolitan Healthcare, Inc., be permitted to assume responsibility for Urban Shelters' obligations. At trial, Mr. Littlejohn explained that, under his proposal, payments to Metropolitan would not have been subject to the IRS lien, and that Metropolitan would therefore have been able to manage the Home without interference from the government.

Mr. Littlejohn testified, however, that he received no response from the District regarding the foregoing suggestion. With this stratagem for avoiding a two-million dollar debt apparently unavailable, Mr. Littlejohn attempted another manipulation of his family's corporate holdings to achieve that end. Specifically, he enlisted the assistance of his daughter, Robin Littlejohn, in transferring money from Urban Shelters to Valrob, Inc., another Littlejohn-controlled company whose assets were not subject to the IRS levy. Mr. Littlejohn instructed Robin to endorse checks payable to Urban Shelters so that they could be deposited into checking accounts maintained in the name of Valrob. From March to October, 1995, Urban Shelters employees were compensated with checks drawn on the Valrob account, and money was transferred as needed between Valrob and Urban Shelters.

By the fall of 1995, the employees had become aware of Urban Shelters' financial difficulties. According to the testimony, their paychecks sometimes arrived late, and on some occasions checks were returned for insufficient funds. In late October, the financial condition of Urban Shelters and Valrob deteriorated further. From October 25 to November 18, 1995, the employees continued to perform their duties at the Home, but they received no compensation at all.

In the middle of November, according to the employees' complaint against the District, some of the employees held a protest at the Mayor's office. They threatened to walk off the job if the District would not guarantee that they would be paid. As the employees note in their brief, "[s]uch a walk-off would [have] create[d] an immediate life threatening situation, because the employees [were] essential to providing the most basic care for the residents of J.B. Johnson, including food, water, medication and assistance with personal hygiene."

5. During this same period, the District of Columbia, the State of Maryland, and the Commonwealth of Virginia all notified Mr. Littlejohn that Urban Shelters was delinquent in paying state withholding taxes as well.

On the day after the protest, in response to the employees' demands, several high-ranking District officials [6] met with a group of employees at the Home. According to the employees, these officials assured them that Urban Shelters would be paid, that the employees would be compensated, and that the IRS would not prevent Urban Shelters from paying its workers. The employees alleged that, in reliance on these assurances, they remained on the job.

When the District officials allegedly made these promises of payment, they may have had some basis for believing that a negotiated resolution of the problem was possible. Mr. Hawkins and Roy Littlejohn had been discussing a proposal under which the District would have paid $50,000 to the IRS each month towards Urban Shelters' arrearage. The District would also have paid Urban Shelters any additional sums due under the contract for the operation of the Home.

These discussions were, however, overtaken by a series of events that materially altered the system of government in the District of Columbia. The employee protest and the meeting with District officials coincided with the assumption by the new federal Financial Control Board of the responsibility for contracting and procurement for the District government. *See Shook v. District of Columbia Fin. Responsibility and Mgmt. Assistance Auth.*, 328 U.S.App.D.C. 74, 76, 132 F.3d 775, 777 (1998). In the process of streamlining the District's procurement practices, then Chief Financial Officer (now Mayor) Anthony Williams concluded that the District's relationship with Urban Shelters was too strained to continue. In his pretrial deposition, Mr. Williams explained

that notwithstanding the hardship to employees of the Home, he saw no reasonable alternative to ending the District's contract with Urban Shelters. In late November, 1995, the District placed its own lien on Urban Shelters' accounts for back taxes owed to the District. A month after District officials had pleaded with J.B. Johnson employees to stay on the job, the District took over the operation of the Home and entered into a contract with VMT Long Term Management, Inc. under which VMT agreed to manage the facility. The Urban Shelters contract was cancelled effective November 19, 1995.[7] The lawsuits which generated these appeals were filed a few months later.

B. *The motions judge's decision.*

On April 10, 1998, the motions judge dismissed without prejudice all claims against the District. The judge held that the CAB was vested with primary jurisdiction over Urban Shelters' claims against the District, and that the court was without authority to consider these claims until the CAB had acted upon them. The employees contended that the CAB was without jurisdiction over their complaint because Urban Shelters was working under an expired contract, because the CAB's jurisdiction was confined to disputes between the District and its contractors, and because, according to the employees, an oral contract with District officials did not implicate the Procurement Practices Act (PPA), D.C.Code §§ 1–1181.1 *et seq.* (1999) or the jurisdiction of the CAB. The motions judge rejected all of these contentions.

The judge held that "Urban Shelters must have its claim reviewed by the CAB before it may properly resort to the court

---

**6.** The complaint alleges that the representatives of the District government who met with the employees included Vernon Hawkins, Director of the Department of Human Services; Gladys Fountain, the Interim Administrator of Long Term Care; and Harvey Sloane, Commissioner of Public Health.

**7.** The Council of the District of Columbia subsequently passed the "Equitable Relief for Certain Persons and Vendors of J.B. Johnson Nursing Center Emergency Act of 1996," D.C. Act. 11–186, 43 D.C.Reg. 382 (Jan. 25, 1996). This enactment did not, however, provide relief for the three and one half week period during which the plaintiffs were not paid.

system." In the judge's view, "it is not for this court to determine the breadth of CAB jurisdiction over this matter; that decision rests with the CAB." Having ruled on jurisdictional grounds without reaching the merits, the judge dismissed the District from the case without prejudice.[8] The employees' suit then proceeded to trial against the remaining defendants.

### C. *The trial judge's findings.*

Following a one-day bench trial on the employees' claims against the Littlejohns, Urban Shelters, and Valrob, the trial judge issued a detailed 22–page ruling. The judge found that, at the times relevant to these proceedings, Roy Littlejohn either owned or exercised managerial control over nineteen separate corporations.[9] Mr. Littlejohn was the sole stockholder of Urban Shelters, and he served as president of that company and as a member of its Board of Directors. Marilyn A. Littlejohn, Roy Littlejohn's wife, served on the Board of Urban Shelters and as the corporation's Secretary/Treasurer. Mr. Littlejohn was also the Chief Executive Officer of Valrob, Inc. Valrob's sole shareholder was Mr. Littlejohn's daughter, Robin. Robin Littlejohn was also the president of Valrob.

All of the Littlejohn-controlled corporations shared a suite of offices in northwest Washington, D.C. The judge found that at the time of trial, none of these corporations possessed any significant assets. The only Littlejohn corporation with employees, Valrob, Inc., had two secretaries, and these individuals also worked as needed for other Littlejohn companies. Valrob paid the rent and other bills for the shared office space "by obtaining loans" from undisclosed sources.

Urban Shelters and Valrob were not the only Littlejohn-controlled corporations involved with the J.B. Johnson Home. Roy Littlejohn owned all of the stock of Savemore Foods, Inc., a company which supplied food to the nursing home pursuant to a contract with Urban Shelters. At some point during the 1980's, Savemore Foods became indebted to Urban Shelters for over $611,000. Savemore Foods later declared bankruptcy, and the debt was never paid. At trial, Roy Littlejohn was unable to explain to the trial judge's satisfaction why Savemore Foods, a company which had supplied goods to Urban Shelters, owed Urban Shelters such a large sum of money. The judge found that the loan "from one company owned by Mr. Littlejohn to another company owned by Mr. Littlejohn did not have a legitimate business purpose." The judge also found that Roy Littlejohn regularly engineered loans from one corporation to another and transferred funds in and out of various corporate accounts. The judge concluded that Mr. Littlejohn had "abandoned [his companies'] corporate entity by commingling funds," that Valrob was no more than a "shell corporation" that "laundered" money received pursuant to the District of Columbia contract, that the various Littlejohn corporations were "indistinguishable from the Littlejohns' own personal financial interests," and that the evidence therefore warranted piercing the corporate veils of Urban Shelters and Valrob.

The trial judge found that the plaintiffs had suffered severe hardship at the hands

8. The judge did not explicitly state that the intervening employees, as distinguished from Urban Shelters, were required to present their claims to the CAB. The dismissal of the District without prejudice, however, effectively disposed of the employees' claims as well.

9. At the time of the Superior Court's ruling, those corporations were: (1) Roy Littlejohn Associates, Inc.; (2) Urban Shelters & Healthcare Systems, Inc.; (3) Valrob, Inc.; (4) Valrob, Ltd.; (5) Capital City Housing Corporation; (6) D.C. Housing Finance Corporation; (7) Caribbean Publications, Inc.; (8) Savemore Foods, Inc.; (9) Hass Hardware, Inc.; (10) Phoenix Associates, Inc.; (11) Pacer/P.L., Inc.; (12) A.P.D. Distributors, Inc.; (13) Western Beef; (14) Camera One, Inc.; (15) Portal Development Association; (16) Metropolitan Home Healthcare; (17) D.H. Lloyd, Inc.; (18) Houston Associates, Inc.; (19) RLA, Inc.

of the Littlejohns, because they had detrimentally "relied upon Urban Shelters and Valrob's representations regarding the payment of withholding taxes." According to the judge's findings, the defendants had represented to the employees of Urban Shelters, by notations on the employees' W–2 forms, that · withholding taxes had been ˙ deducted from their paychecks and had been paid to the appropriate authorities, when withholding taxes had not in fact been paid. The defendants also represented to the employees, on documents which accompanied their paychecks, that money had been deducted from their wages to satisfy court-ordered child support payments and other obligations, and that the deducted amounts had been paid to the appropriate authorities. In fact, Urban Shelters had not forwarded the deducted money to the appropriate court, but instead had apparently retained it. Norman Parker, an employee of Urban Shelters, testified that he first learned of this diversion when he was threatened with arrest for non-payment of child support because sums purportedly deducted to pay that support had not reached the court. The judge credited Mr. Parker's testimony.

The judge also found that· Robin Littlejohn was personally involved in the wrongful manipulation of the corporate form. One Valrob check for $75,006.00, signed by Robin Littlejohn, was made payable to "cash" and included the notation "loan to Urban Shelters." Another Valrob check was apparently used to purchase a $48,066.41 cashier's check for Urban Shelters. Some of the exchanges between the companies were accomplished without the benefit of documentation or collateral, and were never satisfactorily explained at trial.

The trial judge found that Roy Littlejohn dominated decision-making for Valrob and Urban Shelters. Robin Littlejohn testified that although her father owned no Valrob stock, she took her "orders as 'president' of Valrob directly from Roy Littlejohn." The judge concluded that Roy Littlejohn

> took Urban Shelters funds and put· them in separate accounts to defraud the federal government, the IRS and the employees, and ... he · committed fraud against the employees when he used Valrob to launder the District's payment.

The trial judge made no specific finding that Roy Littlejohn had transferred money from corporate accounts to his own personal use or to any member of his family, but the judge did find that Mr. Littlejohn sought to enrich himself at the expense, *inter alia*, of the employees. Mr. Littlejohn claimed that the motivation for his actions was to provide continued care to the residents of the Home, but the judge "reject[ed]" this argument, and found that Mr. Littlejohn's "purpose was personal and beneficial primarily to himself and his family." According to the judge, the evidence "amply established that the corporations are indistinguishable from the Littlejohns' own personal, financial interests." In light of his findings, the judge held that Roy and Robin Littlejohn were liable, as shareholders, for the debts of their corporations.

The trial judge also imposed personal liability on each of the individual defendants for his or her conduct as a corporate officer of Valrob and Urban Shelters. The judge held Roy Littlejohn "liable for his own personal torts" because Mr. Littlejohn "participated, encouraged, and ultimately decided to convert the funds of the employees without their authorization to use for his own personal gain." The judge extended liability to Robin Littlejohn "based on the fact that she signed the checks at issue, [and] managed the accounts," even though Ms. Littlejohn "testifie[d] that she knows very little as to why she was writing checks, what the transferred funds [were] for, where the money came from, or where it went." Robin's mother, Marilyn A. Littlejohn,· was not shown to have been personally involved in

any of the decisions or actions now at issue, but the judge found her liable to the employees because, as a corporate officer, she shared responsibility "for the gross misuse of the corporate form and corporate assets described herein."

Each of the three Littlejohns has appealed from the decision holding him or her personally liable.

## II.

We turn first to the employees' claims against the District. The motions judge, as we have seen, never reached the merits of these claims. She held, instead, that at least for the time being, the Superior Court was not the appropriate forum for the consideration of the employees' allegations. According to the motions judge, the CAB, and not the court, had primary jurisdiction over these claims, and the judge concluded that she lacked authority to pass on the claims at least until the Board had acted.

■ We are constrained to agree with the judge. The doctrine of primary jurisdiction

> applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*Drayton v. Poretsky Mgmt., Inc.,* 462 A.2d 1115, 1118 (D.C.1983); *see also RDP Dev. Corp. v. District of Columbia,* 645 A.2d 1078, 1083 (D.C.1994).

10. The employees' submission states, in pertinent part, as follows:

   The [c]ourt also ruled that insofar as the employee[s]' complaint alleged damages as third party beneficiaries under [the] Urban Shelters contract, their claim would also have to be litigated before the CAB....

■ Although the employees' complaint included several counts, the motions judge's "primary jurisdiction" analysis focused exclusively on the employees' claim that they were known third party beneficiaries of a written contract between Urban Shelters and the District of Columbia. The judge concluded, and we agree, that this written contract was subject to the provisions of the PPA and fell within the specialized competence of the CAB. *See* D.C.Code § 1–1181.4(b) (with exceptions not here relevant, "[t]his chapter shall apply to any contract for procurement of goods and services ...."); § 1–1189.3(b) ("Jurisdiction of the Board shall be consistent with the coverage of this chapter as defined in § 1–1181.4."). Indeed, in their brief in this court, the employees have effectively conceded the correctness of the judge's ruling that their third party beneficiary claim fell within the primary jurisdiction of the Board.[10] It is therefore undisputed that the CAB had primary jurisdiction over at least one of the claims asserted by the plaintiffs.

To be sure, the employees' complaint was not confined to their claim as third party beneficiaries of Urban Shelters' written agreement with the District. On the contrary, the employees also asserted rights under their own alleged separate oral contract with the District, and they asserted additional claims sounding in fraud. The employees now argue, not at all implausibly, that their claimed oral agreement with the District, which was founded upon the promises allegedly made by a cabinet-level official and two of his high-ranking colleagues, was not the kind of written contract "for procurement of goods and services," *see* D.C.Code § 1–1181.4(b), to which the PPA was designed to apply.[11]

The employees do not appeal this portion of the judge's decision.
Brief for Appellants in No. 98–CV–797 at 15 & n. 2.

11. There is, however, authority for the proposition that where an issue arguably falls within the specialized competence of an agency,

■ But we need not decide whether the oral contract claim, standing alone, was subject to the CAB's jurisdiction and expertise. Where any part of a plaintiff's action falls within the primary jurisdiction of an agency, the plaintiff is not permitted to litigate simultaneously against the District both before the agency and before the court. On the contrary, where any of the plaintiff's claims requires an interpretation of the PPA and implicates the expertise of the CAB, the Superior Court is obliged to stay its hand pending a decision by the Board. *See RDP, supra,* 645 A.2d at 1084. The underlying principle has been well explicated in a leading commentary:

> If a court concludes that a dispute brought before the court is within the primary jurisdiction of an agency, it will dismiss the action on the basis that it should be brought before the agency instead. Similarly, *if a court concludes that an issue raised in an action before the court is within the primary jurisdiction of an agency, the court will defer any decision in the action before it until the agency has addressed the issue that is within its primary jurisdiction.* The court retains jurisdiction over the dispute itself and all other issues raised by the dispute, but it cannot resolve that dispute until the agency has resolved the issue that is in its primary jurisdiction.

KENNETH C. DAVIS AND RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 14.1 at 271 (3d ed.1994) (hereinafter DAVIS & PIERCE) (emphasis added).

The foregoing analysis also makes practical sense in terms of "[g]ood judicial husbandry." *United States v. Dogan,* 314 F.2d 767, 771 (5th Cir.1963). "Agency and court jurisdiction to resolve disputes and issues frequently overlap.... Primary jurisdiction is a doctrine used by courts to allocate initial decision-making responsibility between agencies and courts where

such overlaps and potential for conflict exist." DAVIS & PIERCE, *supra,* § 14.1. In this case, the motions judge's decision obviated any prospect of simultaneous duplicative proceedings against the District before the CAB and the Superior Court. Accordingly, the motions judge correctly held that, pending action by the CAB, she could not properly entertain any of the claims against the District.[12]

## III.

■ We now turn to the employees' action against the Littlejohns and the companies which they allegedly controlled. The trial judge, as we have seen, pierced the corporate veils of Urban Shelters and Valrob and held that all three of the Littlejohns were personally liable to the employees. We review the judge's legal conclusions *de novo,* but treat his factual findings as "presumptively correct unless they are clearly erroneous or unsupported by the record." *Auxier v. Kraisel,* 466 A.2d 416, 418 (D.C.1983); *see also* D.C.Code § 17–305(a) (1997); Super. Ct. Civ. R. 52(a). On appeal, the Littlejohns argue that the record does not support the piercing of the corporate veils of Urban Shelters and Valrob. The individual defendants also contest the imposition of personal liability against them as corporate officers.

■ It is important to emphasize at the outset that the legal principles governing the liability of corporate officers for their own tortious acts differ from those applicable to shareholder liability in veil-piercing cases. *See Camacho v. 1440 Rhode Island Ave. Corp.,* 620 A.2d 242, 249 n. 20 (D.C.1993). Corporate officers "are personally liable for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation." *Vuitch v. Furr,* 482 A.2d

---

the agency should be given an initial opportunity to determine whether or not it has jurisdiction. *See, e.g., Grillo v. District of Columbia,* 731 A.2d 384, 386–87 (D.C.1999).

12. In light of this holding, we do not address the District's related claim that Urban Shelters failed to exhaust its administrative remedies.

811, 821 (D.C.1984). "Sufficient participation can exist when there is an act or omission by the officer which logically leads to the inference that he had a share in the wrongful acts of the corporation which constitute the offense." *Id.* (citing *Dwyer v. Lanan & Snow Lumber Co.*, 141 Cal.App.2d 838, 297 P.2d 490 (1956)). "The true basis of [corporate officer] liability is the officer's violation of some duty owed to the third person which injures such third person." 3A FLETCHER CYCLOPEDIA OF CORPORATIONS § 1135 (perm. ed.1999) (hereinafter FLETCHER).

■ Imposition of shareholder liability, on the other hand, requires the piercing of the corporate veil. *Id.* "The general rule is that a corporation is regarded as an entity separate and distinct from its shareholders." *Vuitch, supra,* 482 A.2d at 815 (citation omitted). A "party seeking to disregard the corporate entity [must prove] by affirmative evidence that there is (1) unity of ownership and interest, and (2) use of the corporate form to perpetuate fraud or wrong." *Id.* Although no single factor controls, courts generally inquire, *inter alia,* whether corporate formalities have been observed; whether there has been commingling of corporate and shareholder funds, staff and property; whether a single shareholder dominates the corporation; whether the corporation is adequately capitalized; and, especially, whether the corporate form has been used to effectuate a fraud. *Cf.* FLETCHER, *supra,* § 41.3. No single factor is dispositive, and "considerations of justice and equity may justify piercing the corporate veil." *Bingham v. Goldberg, Marchesano, Kohlman, Inc.,* 637 A.2d 81, 93 (D.C.1994). The inquiry ultimately turns on whether the corporation is, in reality, "an *alter ego* or business conduit of the person in control." *Labadie Coal Co. v. Black,* 217 U.S.App.

D.C. 239, 244, 672 F.2d 92, 97 (1982). With these principles in mind, we address, in turn, the basis of liability for each member of the Littlejohn family.

### A. *Roy Littlejohn.*

(1) *Shareholder liability.*

■ Roy Littlejohn argues that the evidence introduced at trial did not support imposition of personal liability against him for the wrongs and obligations of Urban Shelters. He contends that the employees failed to demonstrate the disregard of corporate formalities,[13] that the corporations were not shown to have been under-capitalized,[14] and that the record contains no evidence that personal assets were commingled with corporate assets. We do not agree with Mr. Littlejohn's position.

The trial judge found that Roy Littlejohn's business decisions erased the boundaries between Valrob, Urban Shelters, and himself. There is ample evidence in the record to support this finding. Mr. Littlejohn acknowledged that in order to shield Urban Shelters' assets from the IRS and from other taxing authorities, he simply transferred its assets to Valrob, another Littlejohn-controlled corporation. The conclusion is inescapable that, as the judge found, Valrob's role in the operation of the Home was essentially to serve as a conduit of funds in order to ensure that the IRS would not seize funds from Urban Shelters and thus put the Littlejohns out of business. The funds of Urban Shelters and Valrob were routinely intermingled. In the judge's words, Valrob was no more than "a 'shell' corporation, used to provide another layer of protection to Roy Littlejohn," and Valrob had no other legitimate purpose. Under our deferential standard of review, we are in no position to second-guess these findings.

---

**13.** The contention that corporate formalities were observed is accurate, if at all, only in the narrowest sense. As the judge found, financial "transactions" between the various Littlejohn-operated companies were very thinly documented.

**14.** This contention is difficult to reconcile with the judge's findings, particularly with respect to Valrob.

Meanwhile, employees of the nursing home were falsely led to believe that portions of their wages were being withheld for child support payments, garnishments, and federal and state taxes, when in fact the creditors of the employees and of their employer were not being paid. Subsequently, for three and one half weeks, the employees were not paid at all. In the words of the trial judge:

> Having racked up significant tax burdens, the Littlejohns have left these corporations to wither. It would be an injustice to hold that the employees' right to redress cannot go beyond these shell corporations to attach funds of the individual wrongdoers.

It is true, as Mr. Littlejohn points out, that much of the manipulation of the corporate form was designed to prevent the IRS and local taxing authorities from securing control over money with which Urban Shelters and Valrob were, *inter alia*, attempting to pay the employees. In that sense, Mr. Littlejohn's conduct might be viewed as defrauding the government in the interest of the plaintiffs who have now sued him. But as we stated in *Vuitch*, *supra*, 482 A.2d at 815, this court

> has held that considerations of justice and equity can justify piercing the corporate veil and has rejected the contention that in order to pierce the corporate veil there must be a showing of fraud directly tainting the obligation on which the plaintiff is suing.

(Citation and internal quotation marks omitted.) [15] The judge could reasonably conclude, on this record, that the paper transfers between the corporations in order to thwart the tax collectors and the false entries which misled employees into believing that their obligations to the government and to other creditors were being satisfied, were all part of a single course of deceptive conduct which proximately led to the collapse of the corporations and their failure to pay the employees their wages. Having used, for his own purposes, funds that he pretended were going to the employees' public and private creditors, Mr. Littlejohn cannot now be absolved of the consequences of his conduct by attributing it to corporations wholly under his control.

**(2)** *Personal liability as a corporate officer.*

■■■ The conduct that led the trial judge to impose personal liability on Roy Littlejohn as a corporate shareholder also warranted imposition of liability as a corporate officer. It is essentially undisputed that Mr. Littlejohn dominated the two corporations and used his authority to engineer the actions which generated Urban Shelters' tax liabilities and caused the corporation to become unable to compensate its employees. Robin Littlejohn's testimony that she acted entirely at her father's direction provides further support for the judge's finding of domination. The judge found that Mr. Littlejohn was "the principal actor" in the operation and that he encouraged and "ultimately decided to convert the funds of the employees, without their authorization, to use for his own personal gain. His motive in this case was to secure a job for himself and the continuation of his otherwise insolvent business." That these actions were ostensibly performed "in the name of the corporation" will not absolve Mr. Littlejohn from liability.

In the final analysis, "[w]e are not so interested in determining whether [Mr. Littlejohn's] actions fit the exact legal definition of fraud or misrepresentation [or conversion]." *State ex rel. Stephan v. Commemorative Servs. Corp.*, 16 Kan. App.2d 389, 823 P.2d 831, 842 (1991). Mr. Littlejohn retained employees' money under the pretext that it was being paid to taxing authorities or to persons entitled to

---

**15.** The plaintiffs' were, of course, required to show that Mr. Littlejohn's control over the corporations and his breach of duty proximately caused the injury or unjust loss complained of. *See Vuitch, supra,* 482 A.2d at 815 n. 5 (citation omitted). For the reasons stated in the text, we conclude that the evidence supports a finding of proximate cause.

child support. "To permit him to hide behind the corporate structure under these circumstances would be a miscarriage of justice." *Id.*

### B. *Robin Littlejohn.*

■ The trial judge found that Robin Littlejohn was actively involved, albeit at her father's direction, with the movement of funds between Urban Shelters and Valrob in order to shelter money owed to the IRS. This finding is amply supported by the record. In our view, Robin Littlejohn may properly be held personally liable to the plaintiffs for her own tortious conduct. In addition, as the sole shareholder of Valrob, she is subject to liability under the veil-piercing principles discussed above.

### C. *Marilyn A. Littlejohn.*

The trial judge imposed personal liability on Marilyn A. Littlejohn on the following grounds:

> As treasurer of Urban Shelters, the [c]ourt must infer that Marilyn A. Littlejohn knows what is going on with the financial transactions of the corporation, and that as treasurer, she either supported, encouraged, or at least allowed, the improper transactions....
>
> The [c]ourt also notes that Marilyn A. Littlejohn did not testify, did not present any evidence on her own behalf, and did not even appear for the trial of this matter. Accordingly, there is no evidence in the record to refute that, as treasurer of the subject corporation, and as corporate secretary, she bears responsibility for the gross misuse of the corporate form and corporate assets....

Mrs. Littlejohn argues that her status as a corporate officer, standing alone, was insufficient to render her liable for the corporation's wrongful acts.

■ As plaintiffs, the employees had the burden of proving that Marilyn A. Littlejohn was personally liable to them. Her failure to testify or to explain any involvement with the transactions at issue could not and did not create liability by default.[16] "An officer's liability is not based merely on the officer's position in the corporation; it is based on the officer's behavior and whether that behavior indicates that the tortious conduct was done within the officer's area of affirmative official responsibility and with the officer's consent or approval." *Camacho, supra,* 620 A.2d at 247; *Vuitch, supra,* 482 A.2d at 821. Liability must be premised upon a corporate officer's meaningful participation in the wrongful acts. *See Camacho, supra,* 620 A.2d at 247. "Sufficient [meaningful] participation can exist when there is 'an act or omission by the officer which logically leads to the inference that he or she had a share in the wrongful acts of the corporation which constitute the offense.'" *Id.* (quoting *Snow v. Capitol Terrace, Inc.,* 602 A.2d 121, 127 (D.C.1992)).

■ We have found nothing in the record to establish, or even to suggest, that Marilyn A. Littlejohn had anything to do with the conduct that led to the imposition of liability against her husband and daughter. The plaintiffs offered no evidence that Mrs. Littlejohn had any knowledge of or involvement in the financial affairs of the corporations. We are aware of no authority for the proposition that failure to prevent wrongful conduct committed by one corporate officer automatically imposes liability upon all other corporate officers. Although liability may in some circumstances be based upon a corporate officer's failure to act to prevent a wrong, the plaintiff must show that the officer's omission bears some relationship to that wrong, *e.g.,* proof that a corporate officer was aware of a dangerous situation and nevertheless permitted reasonably preventable harm to occur. *See Dwyer, supra,* 297 P.2d at 493 (holding corporate president liable for failing to remove dangerous cable from roadway where president knew of the danger but failed to

---

**16.** The plaintiffs were free to take Mrs. Littlejohn's deposition or to use other discovery tools in order to establish her role in the events at issue.

remedy the situation). No comparable evidence was presented in this case, and we conclude that Marilyn A. Littlejohn was entitled to judgment in her favor.

## IV.

The judgment against Marilyn A. Littlejohn is reversed and the case is remanded with directions to enter judgment in her favor. In all other respects, the orders appealed from are affirmed.

*So ordered.*[17]

17. The plaintiffs in this case performed important duties in caring for the elderly and infirm. For almost five years, through no fault of their own, they have not been paid at all for the work that they did over a period of three and one half weeks. The collapse of Urban Shelters, and the failure of remedial legislation to compensate these plaintiffs, have doubtless caused considerable hardship to some of the employees. We express the hope that the matter will be handled with dispatch by all concerned, and that an early resolution can be promptly reached in the interests of justice.