**DISTRICT OF COLUMBIA, Petitioner,**

v.

**DISTRICT OF COLUMBIA PUBLIC SERVICE COMMISSION, Respondent,**

and

**Verizon Washington, DC Inc., Intervenor.**

**District of Columbia, Appellant,**

v.

**Verizon Washington, DC Inc., Appellee.**

**Nos. 06–AA–124, 06–CV–434.**

District of Columbia Court of Appeals.

Argued Nov. 17, 2006.*

Decided Jan. 15, 2009.

* After the parties informed the court at oral argument that they were engaged in negotiations to settle their contract dispute, the court

issued an order instructing the parties to keep the court regularly informed of the progress of their negotiations and of the underlying rate proceeding before the Public Service Commission—either one of which could render this case moot. *See* Order of November 28, 2006. The court subsequently was informed by the parties that their settlement negotiations proved fruitless. As of the day of this opinion, the underlying rate proceeding is still pending before the Commission.

Bennett Rushkoff, Assistant Attorney General, with whom Robert J. Spagnoletti,

Attorney General for the District of Columbia at the time the brief was filed, and Todd S. Kim, Solicitor General, were on the brief for petitioner/appellant.

Christopher Lipscombe, Staff Counsel, with whom Richard A. Beverly, General Counsel of the District of Columbia Public Service Commission, was on the brief, for respondent.

Natalie O. Ludaway, with whom Nicholas S. Penn and Lydia R. Pulley were on the brief, for intervenor/appellee.

Before RUIZ and FISHER, Associate Judges, and FARRELL, Associate Judge, Retired.**

RUIZ, Associate Judge:

This case arises from a dispute concerning the amount the District of Columbia must pay to Verizon Washington, DC Inc. ("Verizon") for emergency telephone services ("E911 services") under the terms of an interim agreement the parties entered into pending final resolution of the applicable rate by the District of Columbia Public Service Commission ("PSC" or "Commission"). The District petitions for review of the PSC's refusal to interpret the parties' obligations under the agreement. It also seeks review of the Superior Court's grant of summary judgment to Verizon requiring the District to pay additional amounts for E911 service under the agreement, even though the PSC rate proceeding has not yet come to a final conclusion. The District argues that the Superior Court erred in deciding the case because primary jurisdiction resided with the PSC as it involved the interpretation of PSC orders, and the exercise of jurisdiction by the court could affect or interrupt proceedings pending before the PSC. In the alternative, the District argues that even if the Superior

** Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on July 1, 2008.

Court properly exercised jurisdiction, the trial court erred in granting summary judgment because it erroneously interpreted the terms of the agreement at the heart of the contract dispute between the parties, and failed to consider evidence of disputed material fact on the issue of damages.

We conclude that the PSC did not err in denying the District's request to clarify its understanding of the parties' contractual obligations, and that, as a result, the Superior Court properly exercised jurisdiction in this case. We affirm the grant of summary judgment on the issue of liability—albeit based on an interpretation of the contract that is different from that of the trial judge—and reverse summary judgment on the issue of damages. Therefore, we affirm the PSC's order, but we vacate and remand the case to the Superior Court for further proceedings.

## I. Facts

The issues on appeal stem from a long-standing dispute concerning the tariff to be paid by the District for Verizon's provision of E911 telephone service. The rate at which Verizon may charge the District for its E911 service is determined by a Price Cap Plan approved by the Commission. On August 16, 2001, Verizon and the Office of the People's Counsel for the District of Columbia submitted a settlement agreement regarding the 2002 Price Cap Plan which, *inter alia,* reclassified Verizon's E911 service as "competitive" from its prior classification as "basic." Operating under the new plan, Verizon filed its E911 service tariff with competitive rates on May 16, 2002.

The District did not challenge the change in classification for Verizon's E911 service until after the PSC had approved the settlement agreement. Ultimately, the District's initial challenge was rejected. However, on September 11, 2002, the District exercised its right, pursuant to the 2002 Price Cap Plan itself, to seek a reclassification of Verizon's E911 service to the basic classification. This became Formal Case No. 1005.

During a hearing held to address the District's reclassification request, Verizon represented that the District had not paid for E911 service since the Price Cap Plan 2002 had become effective in May of 2002. The District acknowledged it had not made any payments and offered to enter into an agreement to make payments for E911 service on an interim basis, subject to a true-up payment at a later date for any additional amount it may owe as a result of a potentially higher rate set by the PSC, or a true-up payment from Verizon for any excess amount the District paid above a lower rate set by the PSC. The District requested that the Commission become a signatory to the agreement, or enter the parties' agreement into the record of the case, so as to provide legal authority to make timely payments to Verizon.[1] After some initial reluctance, the Commission agreed, stating that "[o]nce the parties agree, you can file a stipulation with us and we'll do whatever's appropriate to make sure that everyone's accommodated."

Verizon drafted a letter agreement addressed to the District (the "Letter Agreement"), which they jointly submitted to the Commission on May 14, 2003. The

---

1. Specifically, the District's counsel stated to the Commission:

 My concern was just finding legal authority for the District to make the payment. Historically, we've always made payments when there's a tariff. Although it doesn't actually say so in the statute, we have al- ways taken the position that if there's a tariff, we can just pay under that tariff and procurement law doesn't apply. So I was trying to be able to borrow from that precedent, ... having the Commission's imprimatur on it would, I think, help us just get the payment.

Letter Agreement states that it is not "a compromise or settlement ... but rather ... an accommodation to provide for the continued provision of E911 Service by Verizon and the payment of the agreed upon amounts to Verizon by the District for such E911 Service until the Commission renders its decision in Formal Case No. 1005." Under the terms of the Letter Agreement, the District would make "an interim monthly payment of Sixty Thousand Dollars ($60,000) for Verizon's provision of E911 Service to the District commencing May 30, 2002 until the Commission renders a decision in Formal Case No. 1005 (the Interim Period)." [2] Once the Commission issues the "final decision," the District shall pay the "then-applicable rate for E911 Service." With respect to the payments made during the Interim Period, the parties agreed that

> upon the Commission's issuance of a final decision in Formal Case No. 1005 or a related proceeding that resolves the rate that Verizon lawfully may charge the District for E911 Service provided during the Interim Period, the District promptly shall pay ... without interest, or Verizon promptly shall issue credits ... without interest ... to conform the amounts billed ... during the Interim Period to the Commission's decision.

The Commission issued Order No. 12741 stating that it "finds this Agreement is in the public interest and commends the parties for their efforts to finalize the Agreement and directs that it be filed as part of the record in Formal Case No. 1005." The Order also provides that "Verizon and the District Government are directed to comply with the terms and conditions of the Agreement until the Commission issues a final order in this matter."

On April 1, 2004, by Order No. 13149, the Commission granted the District's request to reclassify the E911 service as a "basic" service, with tariffs subject to prior Commission approval, and suspended Verizon's E911 "competitive" tariff rate from the Price Cap Plan 2002. The Commission further determined that the District was required to pay the competitive E911 rate up until April 1, 2004, the date of the order reclassifying the service and suspending Verizon's tariff, because of the "well-settled prohibition against retroactive rate making," and that, therefore, "[r]elief is prospective, only." PSC Order No 13149, ¶¶ 25, 27, at 10–1 (citing *Verizon Tel. Cos. v. FCC*, 348 U.S.App. D.C. 98, 106–07, 269 F.3d 1098, 1106–07 (2001), *subsequent appeal at Commc'ns Vending Corp. of Ariz., Inc. v. FCC*, 361 U.S.App. D.C. 139, 365 F.3d 1064 (2004). Although the Order suspended the competitive tariff, it did not set a new tariff rate for the period going forward from April 1, 2004. Instead, it informed the parties that until the new rate was set, the Letter Agreement would govern the amount and timing of payments owed by the District to Verizon:

> There is no Commission determination of a final rate in this matter until such time as a new E911 tariff is filed and approved. Thus, Verizon and the District Government continue to be bound by the terms of the May 14, 2003 Letter Agreement and Order No. 12741.

On May 3, 2004, the District filed an application for reconsideration of Order. No. 13149, asserting that the Commission erred in determining that it was required to pay Verizon's E911 competitive tariff rate for the period between May 31, 2002, and April 1, 2004. This request was denied by the Commission in Order No.

---

**2.** The Letter Agreement provides that "[t]hese payments will be made without prejudice to either party's contentions as to what the District actually owes Verizon for E911 Service" during the Interim Period.

13258, issued on July 30, 2004, again relying on the rule against retroactive rate making. The District petitioned for judicial review to this court, and the Commission's decision was affirmed. *See District of Columbia v. D.C. Pub. Serv. Comm'n,* 905 A.2d 249, 250 (D.C.2006).

On December 13, 2004, the Commission issued Order No. 13451, in which it solicited the parties' views on the appropriate procedure for establishing a new rate for E911 service. In a footnote, the Order repeated that the parties remained bound by the Letter Agreement and Order No. 12741. By Order No. 13602, dated June 3, 2005, the Commission announced that it would proceed to determine the E911 service rate through a "rate proceeding rather than through the tariff process under Price Cap Plan 200[2]," and opened a new case on its docket (Formal Case No. 1040), transferring to it all issues related to Verizon's E911 tariff rate.

The District's interim payments under the Letter Agreement for the period up to April 1, 2004, when the Commission suspended the competitive tariff with prospective effect, totaled $1.42 million. On January 21, 2005, Verizon filed a complaint in Superior Court, seeking to compel the District to pay the difference between that amount and what it owed under the original (and since suspended) competitive tariff, which, according to Verizon's calculations, came to $1,449,059.61. Verizon claimed that this payment was required by Commission Order No. 13149, which determined that the suspension of the competitive tariff had no retroactive effect. Relying on the Commission's determination, Verizon argued that the District was required by the Letter Agreement to make a true-up payment to reflect Verizon's competitive rate for E911 service in force between May 31, 2002, to April 1, 2004, when the order suspending the rate was issued. The District responded with a motion to

dismiss based on jurisdictional grounds, arguing that Verizon's request for relief involved interpretation and/or consideration of the Commission's orders and would only be properly resolved by the Commission or this court. According to the District,

> To entertain the merits of Verizon's claim in this civil action would require the Court not only to interpret the [Letter] Agreement between the parties but also to construe the orders of the PSC referring to and incorporating that Agreement. That is, Verizon asks this court to impermissibly inject itself into the PSC proceedings and to usurp the PSC's subject matter jurisdiction.

The District also argued that Verizon's claim for relief was premature because, under the terms of the Letter Agreement, any true-up payment was not due until the Commission issued a "final decision" for the entire rate making proceeding, including the rate Verizon could charge for the E911 service, as reclassified as a "basic" service—a determination that the Commission had not yet reached.

The Superior Court ruled that it had jurisdiction to decide the claim, which the trial judge characterized as "no more to this Court than an enforcement action," noting that "I don't think that I'm being asked to interpret the [P]ublic [S]ervice [C]ommission's order and I am not doing that." Based on the trial court's view that it was not being asked to interpret PSC orders, the District filed a motion with the Commission on August 22, 2005, requesting a "clarification of [the District's] obligations under the Letter Agreement and under the Commission's subsequent orders ... directing the parties to continue to adhere to the Letter Agreement." In Order No. 13790, issued October 18, 2005, the Commission "grant[ed] the District Government's request to clarify [its] intent[,]

but, because of [its] limited role regarding the [L]etter [A]greement, ... decline[d] to express any views on its interpretation."

The District requested reconsideration on November 16, 2005, which the Commission denied by Order No. 13837 on December 15, 2005, primarily because the District government's motion was based "on the same factual predicate" as it proffered in its initial filing. It added, however, that even if it were disposed to interpret the Letter Agreement, the Superior Court had by then already done so "as a matter of law." On February 13, 2006, the District filed a Petition for Review of Commission Orders Nos. 13790 and 13837 with this court. (No. 06–AA–124).

Meanwhile, as the District's motion seeking clarification from the PSC was pending, Verizon filed a motion for summary judgment in the Superior Court on September 30, 2005. On November 28, 2005—after the Commission had denied the District's motion, but while the motion for reconsideration was still pending before the Commission—the trial court orally granted partial summary judgment to Verizon as to "the plain meaning" of the Letter Agreement, but left open the issue of damages. On March 24, 2006, the trial court granted Verizon's request for summary judgment with respect to its requested damages, after ruling that the affidavits submitted by the District were not "relevant to the issue of damages." The District then filed a notice of appeal from the Superior Court's grant of summary judgment and from the "prior orders merged therein." (No. 06–CV–434).

## II. Petition for Review of PSC Order Nos. 13790 and 13837 (No. 06–AA–124)

We address first the District's request for clarification of the PSC's orders that entered the stipulated Letter Agreement into the record and repeatedly directed the parties to comply with its terms. In Order

No. 13790, the Commission granted the District's request to clarify its orders, but stated that "because of [its] limited role regarding the [L]etter [A]greement," it declined to "express any views on its interpretation." The Commission's Order No. 13837 denied the District's request for reconsideration.

 Judicial review of PSC orders is "limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious." D.C.Code § 34–606 (2001). With respect to matters within the PSC's special competence, our review is deferential. *See Jordan v. Pub. Serv. Comm'n,* 622 A.2d 1106, 1110 (D.C.1993). The right to our review, deferential though it may be, requires that the PSC "explain its actions fully and clearly." *Potomac Elec. Power Co. v. Pub. Serv. Comm'n,* 661 A.2d 131, 135 (D.C.1995). If the Commission does so, we will reverse only if the petitioner has borne "the heavy burden of demonstrating clearly and convincingly a fatal flaw in the action taken." *Wash. Gas Light Co. v. Pub. Serv. Comm'n,* 450 A.2d 1187, 1194 (D.C.1982); *see also Potomac Elec. Power Co. v. Pub. Serv. Comm'n,* 402 A.2d 14, 17 (D.C.) (en banc) (characterizing our review of PSC orders in rate-making cases as "the narrowest judicial review in the field of administrative law"), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). Otherwise, "[i]f the findings are supported by substantial evidence, we must accept also the conclusions drawn therefrom unless they are seen to be arbitrary or capricious." *W. Air Lines, Inc. v. Civil Aeronautics Bd.,* 161 U.S.App. D.C. 319, 326, 495 F.2d 145, 152 (1974), *quoted in Watergate Improvement Assocs. v. Pub. Serv. Comm'n,* 326 A.2d 778, 783 (D.C.1974). With respect to a motion to

reconsider, we will not reverse unless the circumstances establish an obvious abuse of discretion. *See Duval Corp. v. Donovan,* 650 F.2d 1051, 1054 (9th Cir.1981) ("A petition for reconsideration by an administrative agency is addressed to that body's discretion. Denial of such a petition should be overturned only upon a showing of the clearest abuse of discretion."), *quoted in INS v. Abudu,* 485 U.S. 94, 107 n. 11, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988)).

■ Petitioner cannot meet its burden in this case. The PSC granted the District's request for clarification, and, in doing so, explained that it had no role in drafting the Letter Agreement, and as such, had no special expertise in interpreting it:

> This is not a situation where the Commission fashioned a remedy. In fact, our role with regard to the letter agreement was quite limited. The parties first brought up the need for the letter agreement at the February 3, 2003, prehearing conference. At that time, the District Government stated that it was not averse to paying Verizon on an interim basis, subject to a true-up. However, the District Government also stated that the arrangement would normally have to be effected through a sole source contract and expressed concern that the contracting process could take months. As an alternative, the District Government suggested an agreement that would have the *imprimatur* of the Commission. Verizon, on behalf of both parties, offered to submit their agreement as a stipulation, which would then become a stipulated order when signed by the Commission. The Commission was reluctant to issue a stipulated order with implications regarding the Procurement Act and suggested that the parties could simply enter into their own arrangement and submit it for the record.

> The parties subsequently submitted their agreement. No stipulated order was ever issued. The parties entered into this arrangement of their own volition without the involvement of the Commission. We have no special insight into the parties' intent on the agreement terms. For that reason, unless the court directs otherwise, we decline to offer our legal opinion on an issue that the court can resolve as a matter of law.

(footnotes omitted).

In denying the District's motion for reconsideration, the Commission confirmed the view it had expressed earlier, and added, with respect to its various orders stating that the parties should comply with the Letter Agreement, that "all language referencing the agreement is nothing more than dicta [which] ... neither establishes the rights or obligations between the parties nor approves the agreement itself."

On this record, where the Commission explained its reasons for not interpreting the Letter Agreement, and stated that references to it in the Commissions orders were "dicta," we cannot conclude that the PSC acted in an arbitrary or capricious manner, when its action was based on the premise—well-supported by the record—that the Letter Agreement had been entered by stipulation of the parties, without substantive involvement by the Commission.

### III. Appeal of Superior Court's Grant of Summary Judgment (No. 06–CV–434)

#### A. *Jurisdiction*

The District argues that we should vacate the trial court's grant of summary judgment because the Superior Court improperly exercised jurisdiction to hear Verizon's complaint. According to the District, "For the Superior Court to deter-

mine a matter that is already governed by interlocutory orders in a pending PSC proceeding poses a similar risk of interference with established regulatory processes as the sort of judicial involvement that gave rise to the primary jurisdiction doctrine." [3]

■ The doctrine of primary jurisdiction "comes into play whenever enforcement of the claim requires the resolution of issues which ... have been placed within the special competence of an administrative body." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *see D.C. Water & Sewer Auth. v. Delon Hampton & Assocs.*, 851 A.2d 410, 417 (D.C.2004) ("The doctrine of primary jurisdiction is rooted in teaching that 'in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies ... should not be passed over.'" (quoting *Am. Ass'n of Cruise Passengers v. Cunard Line*, 308 U.S.App. D.C. 177, 179, 31 F.3d 1184, 1186 (1994))). The doctrine of primary jurisdiction does not negate that the court has jurisdiction; rather, it informs the court's determination whether to exercise its jurisdiction with respect to a specific matter. *See Matthews v. District of Columbia*, 875 A.2d 650, 655 (D.C.2005) (noting that under doctrine of primary ju-

risdiction, "issues in claims that are originally cognizable in the courts may, nonetheless, be referred to an administrative body for resolution when the issue falls within the 'special competence' of an agency") (citing *Lawlor v. District of Columbia*, 758 A.2d 964, 973 n. 11 (D.C.2000)). Therefore, unlike in cases where the trial court's jurisdiction is challenged, and we review *de novo* the legal issue of jurisdiction *vel non*, the Superior Court's determination whether to defer its authority in favor of an agency's determination applying principles of primary jurisdiction is reviewed for abuse of discretion. *See Nat'l Tel. Coop. Ass'n v. Exxon Mobil Corp.*, 345 U.S.App.D.C. 257, 260, 244 F.3d 153, 156 (2001) ("We review the district court's decision to the contrary only for abuse of discretion."); *Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir.1996); *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 947–48 (10th Cir.1995); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1162 (3rd Cir.1993).[4]

■ The complaint before the Superior Court was for breach of contract, requiring interpretation of the Letter Agreement and enforcement of its terms. This is the type of case, as the trial court noted, regularly decided in the Superior Court, pursuant to well-established rules of contract

---

3. In addition to claiming that the PSC had primary jurisdiction to interpret its orders binding the parties to the Letter Agreement, the District also makes the related claim that the ongoing rate proceedings precluded the Superior Court from acting on Verizon's complaint to interpret and enforce the Letter Agreement and assess damages for breach. The District notes that "[b]y accepting Verizon's invitation to resolve issues that required interpretation of the Letter Agreement and the related PSC orders, the Superior Court risked interfering with the PSC's control over its rate proceeding." The District, however, has not demonstrated that—nor how—the proceedings currently before the PSC, which involve setting a new rate for E911 service,

would be affected by the trial court's resolution of the controversy over the terms of the Letter Agreement.

4. In *Matthews*, we applied *de novo* review to legal issues that formed part of the consideration whether the trial court should defer to the agency's primary jurisdiction. *See* 875 A.2d at 654 (noting two issues of statutory interpretation that guided trial court's determination to refer matter to agency under doctrine of primary jurisdiction); *id.* at 657 (acknowledging that there might be situations where agency, not court, could be primary forum to determine paternity for purposes of establishing benefit eligibility).

interpretation. The parties did not dispute that they were bound by the Letter Agreement, and the only question before the court was at what point the District is required to make a "true-up" payment to Verizon for E911 service during the Interim Period. As the PSC recognized, it has no special competence in interpreting the terms of a private agreement between the parties, which did not involve technical issues within the Commission's expertise. *See Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 97 (2d Cir.1996) ("[T]he primary jurisdiction doctrine [is] inappropriate because the issues of contract interpretation here are neither beyond the conventional expertise of judges nor within the special competence of the PSC."). The District's contention that summary judgment was improper because the contract is ambiguous is premised on resolution of a legal issue. *See Tillery v. D.C. Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C.2006) ("The proper interpretation of a contract, including whether a contract is ambiguous, is a legal question . . . ."). Although interpreting the Letter Agreement required *reading* PSC orders referred to in the contract (in order to determine, for example, what precisely was meant by "Formal Case No. 1005"), and that agreement had to be read against the background of the proceeding pending before the Commission, *see Patterson v. District of Columbia*, 795 A.2d 681, 683 (D.C.2002) (noting that "the objective reasonable person assessing the contract's language 'is presumed to know all the circumstances before and contemporaneous with the making of the agreement'" (quoting *Adler v. Abramson*, 728 A.2d 86, 87 (D.C.1999)), the obligations of the parties under the terms of the Letter Agreement were not themselves dependent on resolution of technical issues within the Commission's special competence. Thus, while the Commission determined as a matter of administrative law that the competitive tariff applied to the period from May 30, 2002 to April 1, 2004 (a determination that was affirmed by this court, also as a matter of administrative law), the remaining question of what constitutes the PSC's "final decision" that triggers the obligation for a "true-up" payment under the Letter Agreement, is purely a matter of contract law. Moreover, the Commission did not intend, as it made clear, that references to the Letter Agreement in its Orders (which it characterized as "dicta") would define the obligations between the parties *vis à vis* the Letter Agreement, which was a contract solely between Verizon and the District. Nor would the court's consideration and disposition of Verizon's complaint for breach of contract interfere with or inhibit the Commission's ability to decide the pending rate proceeding that is within its special expertise to establish the rate for E911 service to apply post-April 1, 2004. We conclude that the interpretation of the contract was properly before the court, as it lay outside the expertise of the PSC. Therefore, the Superior Court did not abuse its discretion in exercising jurisdiction.[5]

---

5. We note, however, that although the PSC had already issued its first order clarifying that it did not regard interpretation of the Letter Agreement as within its expertise when the court decided to exercise jurisdiction, there was still pending the District's request for reconsideration. In such a circumstance, the trial court should have prudently waited for the Commission's final determination on the issue. As the Commission noted in denying the District's request for reconsideration, by that point it was constrained by the fact that the court had already decided the matter. *See Matthews*, 875 A.2d at 657 (noting that an agency is to be given "initial opportunity to determine whether an issue is within its special competence"); *see also Lawlor*, 758 A.2d at 974 ("Where any part of a plaintiff's action falls within the primary jurisdiction of an agency, the plaintiff is not permitted to litigate simultaneously . . . both before the agency and before the court.")

B. *Summary Judgment*

The trial court first granted partial summary judgment to Verizon on the question of liability, because it thought that "the plain meaning of the [L]etter [A]greement is pretty clear." The trial court considered, however, that there might be a question as to the proper amount of damages, and withheld ruling on summary judgment with respect to damages to allow the District an opportunity to provide additional evidence showing material issues of fact related to the amount of damages claimed by Verizon. After receiving a second affidavit from the District (from Peter Roy, Deputy Chief Technology Officer for the District of Columbia) the trial court granted summary judgment to Verizon on the amount of damages, finding that the evidence presented in the affidavits "merely contained speculation or opinions of Mr. Roy, some not relevant to the issue of damages," and that the District had failed to make timely objection to the accuracy of Verizon's invoices. On appeal, the District challenges both grounds for the trial court's grant of summary judgment.

 Our review of summary judgment is *de novo*, applying the same standard as the trial court in considering the motion for summary judgment. *See Holland v. Hannan*, 456 A.2d 807, 814 (D.C. 1983). Specifically, the moving party is required to establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* Super. Ct. Civ. R. 56(c). In addition, this court is required to "conduct an independent review of the record ... [to] determine whether any relevant factual issues exist by examining and taking into account the pleadings, depositions, and admissions along with any affidavits on file, construing such material in the light most favorable to the party opposing the motion." *Graff v. Malawer*, 592 A.2d 1038, 1040 (D.C.1991) (citation omitted).

1. *Liability*

 "The proper interpretation of a contract, including whether a contract is ambiguous, is a legal question, which this court reviews *de novo*." *Tillery*, 912 A.2d at 1176; *see also Akassy v. William Penn Apts. Ltd. P'ship*, 891 A.2d 291, 299 (D.C. 2006). We apply the so-called "objective" law of contracts, which requires us, in the first instance, to "rely solely upon [the contract] language [when factally unambiguous] as providing the best objective manifestation of the parties' intent." *Bolling Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 475 A.2d 382, 385 (D.C.1984), *quoted in Tillery*, 912 A.2d at 1176; *see Patterson*, 795 A.2d at 683 (noting that objective interpretation assumes knowledge of circumstances preceding and contemporaneous to contract formation). In addition, when a court interprets a contract, "[t]he writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms." *1010 Potomac Assocs. v. Grocery Mfrs. of Am. Inc.*, 485 A.2d 199, 205 (D.C.1984). The terms, moreover, must be interpreted in light of the circumstances known to the parties at the time of contract formation. *See* 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 32:7, at 434–35 (4th ed. 1999) ("In construing a contract, a court seeks to ascertain the meaning of the contract at the time and place of its execution."). Applying those principles, the court interprets the unambiguous terms of a contract as a matter of law. *See Saul Subsidiary II Ltd. P'ship v. Venator Group Specialty, Inc.*, 830 A.2d 854, 861 (D.C.2003) (citing *1010 Potomac Assocs.*, 485 A.2d at 205)). But, where a contract is ambiguous, *i.e.*, "reasonably susceptible of different constructions or interpretations," *Rastall v. CSX Transp., Inc.*, 697 A.2d 46, 51 (D.C. 1997) (quoting *Kass v. William Norwitz Co.*, 509 F.Supp. 618, 623 (D.D.C.1980), the meaning of the language must be evinced

from extrinsic evidence on the intent of the parties—a factual determination. *See 1010 Potomac Assocs.*, 485 A.2d at 205 ("Extrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous."). Because consideration of such extrinsic evidence is for the fact finder, once a contract is determined by the trial court to be ambiguous, summary judgment is necessarily improper. *Scrimgeour v. Magazine*, 429 A.2d 187, 188–89 (D.C.1981) ("If [material contract terms are] ambiguous, an issue of material fact exists which precludes summary judgment.").

■■■ The brief two-page Letter Agreement provides:

This letter serves to memorialize the agreement reached between Verizon Washington, D.C. Inc. (Verizon) and the Office of the Chief Technology Officer (OCTO) on behalf of the District of Columbia (the District) regarding the District's payments to Verizon for E911 Service provided by Verizon to the District during the pendency of Formal Case No. 1005 before the Public Service Commission of the District of Columbia (Commission). In Formal Case No. 1005, the District has requested that the Commission reclassify the competitive status of Verizon's tariffed E911 Service, and Verizon has opposed the request.

The District has offered and Verizon has agreed to accept an interim monthly payment of Sixty Thousand Dollars ($60,000) for Verizon's provision of E911 Service to the District commencing May 30, 2002 until the Commission renders a decision in Formal case No. 1005 (the Interim Period).... These payments will be made without prejudice to either party's contentions as to what the District actually owes Verizon for E911 Service since May 30, 2002.

Furthermore, the parties agree that, upon the Commission's issuance of a fi-

nal decision in Formal Case No. 1005 or a related proceeding that resolves the rate that Verizon lawfully may charge the District for E911 Service provided during the Interim Period, the District promptly shall pay additional amounts to Verizon, without interest, or Verizon promptly shall issue credits to the District, without interest, as the case may be, to conform the amounts billed by Verizon and paid by the District during the Interim Period to the Commission's decision. After issuance of the final decision, the District shall pay the then-applicable rate for E911 Service....

If any of the terms or conditions of this agreement are inconsistent with the provisions of the Commission's final decision in Formal Case 1005 or a related proceeding that resolves the rate that Verizon lawfully may charge the District for E911 Service provided during the Interim Period, then the provisions of such Commission decision shall control.

Both Verizon and the District agree that the Letter Agreement required the District to make monthly payments of $60,000 for services rendered during the Interim Period, and that at some point the payments made would be subject to a "true-up" adjustment. The Letter Agreement clearly provides that the true-up either would require the District to pay Verizon the difference between what it had paid under the Letter Agreement and what it owed (as determined by the PSC); or, if the amount the District owed was less than what it had already paid during the Interim Period, Verizon would be required to issue credits to the District. What is under dispute is whether a true-up became due on April 1, 2004, when the amount payable by the District for E911 services up to that date was determined by the Commission as a matter of law (by application of the rule against retroactive rate making) or whether the true-up does not

occur until the PSC issues "a final decision" on the rate the District must pay for E911 services going forward from that date.

Verizon's interpretation that the District was obligated to make a true-up payment as of April 1, 2004, is based on the language in the Letter Agreement that when the PSC makes "a final decision in Formal Case No. 1005 or a related proceeding that resolves the rate that Verizon lawfully may charge the District for E911 Service provided during the Interim Period, the District promptly shall pay." (emphasis added). Verizon argues that the PSC's granting, on April 1, 2004, of the District's request to reclassify the E911 services as "basic," which had the legal effect of binding the District to pay the "competitive" rate that had been set by Verizon up to that date, constitutes "a final decision *in* Formal Case No. 1005," under the Letter Agreement and warrants a true-up payment as of that date.

Furthermore, under Verizon's interpretation, which was adopted by the trial court, the Interim Period came to an end on April 1, 2004, and the Letter Agreement itself lapsed, leaving the parties with no agreement to govern their relationship (either requiring Verizon to provide E911 services or the District to make interim payments therefor), notwithstanding that the PSC has not yet established the rate that is to apply for E911 services post-April 1, 2004. This argument is based upon the language of the Agreement defining "the" Interim Period as "commencing May 30, 2002 until the Commission renders *a* decision *in* Formal case No. 1005)." (emphasis added). According to Verizon (and the trial court) the Commission's order on April 1, 2004 was such an order, which terminated the Interim Period on that day. Because the Letter Agreement requires the District to pay Verizon in exchange for E911 services only during the Interim Period, upon its termination any further obligations imposed by the Letter Agreement also came to an end.

In our view, such a reading is not faithful to either the letter or purpose of the Letter Agreement. In the same paragraph defining "the" Interim Period, the Letter Agreement further provides that after the true-up payment, pursuant to the Commission's final order, "the District shall pay the then-applicable rate for E911 Service." Such language necessarily presupposes that the Commission will have decided the rate "then-applicable" before the true-up is due. Any interpretation of the Agreement which allows for the Interim Period to terminate prior to the Commission's determination of the appropriate rate for Verizon's E911 service would render this language surplusage—an interpretation we must avoid. *See 1010 Potomac Assocs.*, 485 A.2d at 205 ("The writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms."). Most important, in light of the overall purpose of the Letter Agreement to establish a *modus vivendi* until the Commission decided the rate for E911 service as "basic," we have no doubt that the parties did not intend that this interim accommodation would terminate prematurely on April 1, 2004—regardless of whether a final rate had been set—with the result there would be no contract binding Verizon to continue to provide E911 services, and no stipulation as to the interim payments the District is obligated to pay, until the PSC's ultimate resolution of the applicable rate. If one thing is clear it is that the Letter Agreement was intended to ensure the provision of crucial E911 services and a payment stream to Verizon, until the proper rate Verizon may lawfully charge for its E911 service is finally resolved by the PSC.

Turning to the District's interpretation, the term "final decision" (regardless of whether preceded by "a" or "the") refers not to the PSC's decision to reclassify Verizon's E911 service (which in the District's view only incidentally fixed the pre-April 1 rate by ruling that the reclassification decision could not have retroactive effect), but meant only the PSC's complete determination of the reclassification question, including setting the proper rate that applies to Verizon's E911 service as a "basic" service. Because the PSC has yet to issue such a rate in the still-pending proceeding, there is no "final decision" terminating the Interim Period, and triggering the true-up payment.

An alternative interpretation is that the Interim Period continues until *the* final order determines the applicable rate, but that any order that determined the rate of Verizon's E911 service for a period within the Interim Period (*i.e.*, the April 1, 2004 order) required a true-up payment with respect to that sub-period. This interpretation requires drawing a distinction between the Letter Agreement's reference to "a" and "the" final order of the Commission. But to impute a meaning of such consequence to these words ("a final decision" and "the final decision") goes against the Letter Agreement's express and unambiguous definition of a single Interim Period, which is to end when the PSC issues "a final decision in Formal Case No. 1005," [6] at which time the District is to pay the "then-applicable rate for E911 Service." Although such an approach could have formed a reasonable basis for settlement in the parties' failed negotiations in order to take into account the Commission's interim order of April 1, 2004, it is not the

judicial function to mediate disputes or reform the parties' agreement, but to interpret the contract's terms as of the time of its formation in light of what the parties expected at the time. See LORD, *supra*, § 32:7, at 434–35. Simply put, the proceedings may not have developed as the parties anticipated and no provision appears to have been made on the face of the Agreement for such an eventuality. Normally we would have to determine whether in view of changed circumstances, a remand is required for fact finding on what the parties intended had they anticipated the Commission's bifurcated proceeding. *See id.* § 32:7, at 435–36 ("[A]lthough the parties may not, because of the parol evidence rule, testify as to agreements they made before or contemporaneously with the execution of the contract, the *circumstances surrounding* the execution of the contract bear upon the contract's meaning." (emphasis added) (footnotes omitted)).

We need not make that determination in this case because in our view, under the circumstances before us, the question of the continuation of the Interim Period under the terms of the Letter Agreement and the District's obligation to pay as of April 1, 2004, are separable. The Letter Agreement's self-described purpose is to serve as "an accommodation to provide for the continued provision of E911 service by Verizon and the payment of the agreed upon amounts to Verizon by the District for such E911 Service until the Commission renders its decision in Formal Case No. 1005." As the Commission has yet to finally resolve the tariff that Verizon may lawfully charge post—April 1, 2004, we interpret the Interim Period as ongoing

6. Although the Commission renumbered the case as No. 1040, no one disputes that the matter to be determined in the case remains the same—the basic rate for E911 service. As the Commission stated in its Order of April 1,

2004, "There is no Commission determination of a final rate in this matter until such time as a new E911 service tariff is filed and approved."

and the Letter Agreement as binding Verizon to continue to provide such services in exchange for the stipulated monthly rate, until the Commission decides the proper rate and a definitive true-up can be made.

That is not to say, however, that continuation of the Letter Agreement until the tariff is set by the Commission prohibits settlement of the parties' accounts to the extent that the Commission's orders mandate. The Letter Agreement provides that:

> If any of the terms or conditions of this agreement are inconsistent with the provisions of the Commission's final decision in Formal Case 1005 *or a related proceeding that resolves the rate that Verizon lawfully may charge the District for E911 service provided during the Interim Period, then the provisions of such Commission decision shall control.*

(emphasis added).

In this case the Commission has ordered, relying on the rule against retroactive rate-making, that any relief it may grant is "prospective only" and that "the District is obligated to pay" at the competitive tariff rate for services rendered up to April 1, 2004, when the Commission reclassified the service from "competitive" to "basic." *See* PSC Order No. 13149; PSC Order No. 13258, ¶ 2, at 1 ("[T]he Commis-

sion determined that the District Government was *obligated to pay* the tariff rate under Verizon's E911 tariff up until the date of the issuance of [the April 1, 2004 Order]." (emphasis added)). Therefore, even if the Letter Agreement were interpreted so that a true-up is due only upon the Commission's final order setting the tariff for E911 service as a "basic" service (the District's interpretation), the Letter Agreement also specifically provides that if its terms are inconsistent with an order of the Commission setting the rate for services "during the Interim Period," the parties are bound by the Commission's order. We conclude that the PSC's Order No. 13149 unequivocally states that the District is "obligated to pay" Verizon for its E911 services rendered up to April 1, 2004 at the competitive rate.[7] *See* PSC Order No. 13149, 27, at 11. These services, also unequivocally, were provided "during the Interim Period." As the Commission has resolved the rate that Verizon may charge up to April 1, 2004, and indeed the Commission is without authority to alter that rate in its final order setting the basic tariff, any "inconsistent" terms in the Letter Agreement that would defer payment until the issuance of a "final order" must give way to the Commission's subsequent order.[8]

---

7. The District proffered a similar interpretation of this language in the Letter Agreement in its Motion for Clarification filed before the Commission on August 22, 2005. ("[T]he Commission's directive in Order No. 13149 that the parties *continue* to be bound by the terms of the Letter Agreement would trump the Letter Agreement's true-up provision."). Though we also rely on the same language in the concluding paragraph of the Letter Agreement, we do not otherwise adopt the District's argument because to do so would require us to rely on the Commission's interpretation of the parties' agreement—an interpretation the Commission has expressly disavowed. See *infra,* note 9.

8. We emphasize the distinction between our holding that the parties have contractually obligated themselves to be bound by a Commission order inconsistent with the terms of their agreement and our earlier recognition that the Commission properly refused to interpret the parties' agreement. The Commission's Order that the District is "obligated to pay" is not an interpretation of the parties' agreement, but rather a straightforward application of the rule against retroactive rate making, pursuant to the agreement itself, and is binding on the parties.

## 2. *Damages*

■ In addition to granting Verizon's motion for summary judgment with respect to the District's obligation to pay Verizon for E911 services rendered up to April 1, 2004, the trial court also granted summary judgment with respect to the damages claimed by Verizon. The trial court concluded that, as argued by Verizon, the District either had waived any right it had to contest the amount invoiced by Verizon, or, in the alternative, the District presented no disputed issue of material fact with respect to the charges. We reverse the grant of summary judgment on the issue of damages. Based on our review of the record, the question of whether the District had waived the opportunity to contest Verizon's invoices was factually disputed and the District did present sufficient evidence of a dispute as to the correct amount owed by it to Verizon for its E911 service. Both are questions of material fact.

Whether the District waived any objection it might have to the invoices provided by Verizon is disputed by Peter Roy, Deputy Chief Technology Officer of the Government of the District of Columbia. Mr. Roy's second affidavit stated that "the District repeatedly gave notice to Verizon that the District considered the tariff to be invalid and the District repeatedly notified Verizon that the manner in which Verizon configured the tariff ... made it impossible for the District to pay in accordance with the tariff." In an email dated August 12, 2002, Mr. Roy explained his objections:

(a) Verizon's invoice charges $55.30 per 1,000 ALI records, and presents a quantity of 1,291 as the multiplier. This means that Verizon is claiming that there are 1,291,000 "ALI records", but Verizon provided no auditable support for this amount.

(b) There is also no explanation for what an "ALI record" is, and how Verizon proposes to measure such units.

(c) There is a charge for "Digital Data Service" of $483/month with no explanation as to what it is or how it was calculated.

(d) There is a charge for trunking at $19,882 per month with no explanation regarding what it is or how it was calculated.

As Verizon cites no authority requiring the District's notice to be any more specific, there is sufficient evidence for a jury to conclude that Verizon had been notified of the District's objection to Verizon's invoice.[9] With respect to the timing of the District's objections, a jury could find it telling that while Verizon concedes in its brief that no monthly invoice was sent for the month of June in 2002 (the first month for which such an invoice for Verizon's E911 service under the competitive tariff was due), Mr. Roy's written objection was sent on August 12, 2002, well within thirty days of when Verizon would have issued its next invoice (for July). Moreover, Mr. Roy claims in his affidavit that he did not receive the June 2002 invoice until August 8, 2002. Either Mr. Roy's written objection was timely received within thirty days of when Verizon would have issued a July invoice, or Mr. Roy objected within a reasonable time to the June invoice he received on August 8—an invoice Verizon asserts was never sent. Additionally, Mr. Roy's assertion that he received this invoice on August 8 is supported by the fact

---

**9.** Verizon's General Regulations Tariff, which prescribes the time within which the District may raise any objection, provides: "If objection, which the Telephone Company may require to be in writing, is not received by the Telephone Company within 30 days after a statement of account is rendered, such statement shall be deemed to be correct and binding upon the customer."

that the invoice itself is curiously addressed to the city of "Washington," but in the state of *Virginia*. We hold that based upon this evidence a reasonable jury could conclude that the District had in fact timely objected to Verizon's tariff calculations.[10]

We also disagree with the trial court's conclusion that the District "has not presented record evidence that the invoices at issue are inaccurate." Specifically, the court found that while Mr. Roy's second affidavit was more comprehensive than the others, it nevertheless presented no evidence contradicting the accuracy of Verizon's invoices, but rather contained merely "speculation" or "opinions" of Mr. Roy. Mr. Roy's second affidavit raises several objections to the size of the ALI database (1.3 million), upon which Verizon relied to calculate the amount to charge the District for E911 service. Mr. Roy argues that this figure is nearly three times higher than his own estimate, which he supports by explaining that the ALI database should be roughly equivalent to the number of access lines within the District. On this record, we cannot—nor could the trial court—determine whether the District's or Verizon's calculation of the ALI database is correct, but we do recognize that it is a disputed issue that is significant in determining the correct amount owed to Verizon by the District. The issue appears to be highly technical in nature and the trial court may determine that expert testimony would assist the jury.[11] Because there exist genuine issues of disputed material facts the trial court's grant of Verizon's motion for summary judgment was improper.

\* \* \*

In conclusion, we reject the District's petition for review of the PSC's Orders denying the District's request to interpret its obligations under the Letter Agreement, affirm the trial court's grant of summary judgment in favor of Verizon on the question of the District's obligation to pay for E911 services from May 30, 2002, to April 1, 2004, and remand the case to the Superior Court for further proceedings on the issue of damages consistent with this opinion.

*So ordered.*

---

10. We are unpersuaded by Verizon's argument that the District did not similarly object to subsequent invoices. To the extent that the District's objection was to the "manner in which Verizon configured the tariff," Verizon was on notice and the District's objection extended to subsequent invoices that were "configured" on the same basis. Moreover, Mr. Roy's second affidavit states that the District "repeatedly" objected to the invoices sent by Verizon.

11. For example, although not in the record, our research shows that an Automatic Location Identification (ALI) database contains a list of access lines. An access line is "roughly equivalent to a telephone number associated with a street address." (Roy Aff. ¶ 4–7, Nov. 16, 2005.) Because an ALI database links a caller's address with the caller's number:

> [ALI] capability permits rapid response in situations where callers are disoriented, disabled, unable to speak, or do not know their location. In these situations, ALI permits the immediate dispatch of emergency assistance to the address of the wireline phone. ALI also reduces errors in reporting the location of the emergency and in forwarding accurate information to emergency personnel.

*In re* Revision of the Commission's Rules To Ensure Compatibility with Enhanced 911 Emergency Calling Systems, 11 F.C.C.R. 18,676, at 18,679 (July 26, 1996).