Dennis J. DYER, Appellant,

v.

Idriis BILAAL, et al., Appellees,

and

Idriis Bilaal, et al., Appellants,

v.

Vincent Abell, et al., Appellees.

Nos. 07–CV–1057, 08–CV–1562, 09–CV–76.

District of Columbia Court of Appeals.

Argued Sept. 28, 2009.
Decided Nov. 12, 2009.

Gregory M. Fisher, Washington, for Dennis Dyer, appellant in No. 07–CV–1057.[1]

Dominic F. Perella, with whom Sten A. Jensen, Jeffrey D. Pariser, and Jake M. Shields were on the brief, for appellees in No. 07–CV–1057 and appellants in No. 08–CV–23.

Lydia Auzoux, with whom David H. Cox, Washington, was on the brief, for Vincent Abell, Modern Management Company, and Marta Bertola, appellees in No. 08–CV–23.

Before GLICKMAN and FISHER, Associate Judges, and FARRELL, Senior Judge.

FISHER, Associate Judge:

These consolidated appeals require us to construe two settlement agreements that relate to the same litigation. Several former homeowners sued Dennis Dyer, Vincent Abell, and other defendants, alleging that they had been engaged in a mortgage foreclosure rescue scam, ultimately defrauding plaintiffs out of the equity in their homes. Defendants denied the allegations. Rather than go to trial, the parties entered into separate agreements, one (seemingly) resolving the claims made against Dennis Dyer by the estate of Willie King, and the other settling the remaining claims, including those by Raymond James against Vincent Abell and Modern Management Company. Thereafter, the trial court granted a motion to enforce the first agreement against Mr. Dyer but denied a motion which asserted that Mr. Abell and others had failed to comply with the second agreement. We affirm the first judgment and reverse the second.

## I. The Procedural Background

Six homeowners, including Willie King and Raymond James, brought suit against the defendants, alleging fraud and other torts as well as violations of state and federal lending laws and consumer protection laws. They claimed that the defendants approached them individually with offers to save their homes from foreclosure by loaning them money. The homeowners understood that they would remain in their homes, that they would pay the amount of the mortgage payments (plus an additional amount) directly to defendants instead of to the bank, and that the defendants would be responsible for paying the mortgage, keeping the extra money in return for

---

1. We have consolidated four appeals. Mr. Dyer, the appellant in three of those appeals, did not submit briefs in No. 08–CV–1562 and No. 09–CV–76, explaining that he considers "the matters raised in [those appeals] as inci- dent to and derivative of those he has appeal- ed in No. 07–CV–1057." Accordingly, the outcome of the two appeals first mentioned in this footnote depends upon our disposition of No. 07–CV–1057.

their services and as repayment of the loan.[2]

Instead of merely signing loan documents, however, the plaintiffs unwittingly transferred title to their homes for a fraction of their value and became tenants. However, the original homeowners remained personally liable on the mortgages. Thereafter, the plaintiffs became concerned that the defendants were not crediting the monthly payments to the mortgages (some plaintiffs received new arrearage notices and some were suspicious because they could no longer reach the defendants). Several plaintiffs, unable to pay rent and shoulder the entire amount of the pre-existing mortgage payments or mounting late fees, opted to send their monthly mortgage payments directly to their bank and stopped sending the defendants any money. The defendants sued those plaintiffs for failure to pay rent.

The defendants, by contrast, claimed that they never held themselves out as mere money lenders and clearly communicated that they were purchasing the homes, leasing them back, and giving the former homeowners refinancing assistance or an option to repurchase. They never agreed to assume liability for the mortgages; they only agreed to pay the initial amount of arrearages necessary to avoid foreclosure.

Without admitting liability, the defendants settled the case in two segments. One agreement was reached on May 28, 2007, between Mr. Dyer and the estate of Mr. King.[3] Plaintiffs' counsel read the material terms of that agreement into the court record on May 29, 2007, the day set for trial. The apparent success of these parties in resolving their portion of the litigation prompted the remaining parties to renew settlement discussions, and they executed a separate agreement on August 23, 2007. Later events led certain plaintiffs to file two motions to enforce the agreements. We will supply more details when analyzing the various issues presented in these appeals.

## II. General Contract Principles

■ Settlement agreements are construed under "general principles of contract law." *Goozh v. Capitol Souvenir Co.*, 462 A.2d 1140, 1142 (D.C.1983) (quoting *Brown v. Brown*, 343 A.2d 59, 61 (D.C. 1975)). Accordingly, we enforce a valid and binding settlement agreement just like "any other contract." *Rommel v. West American Insurance Co.*, 158 A.2d 683, 684–85 (D.C.1960).

■ This jurisdiction adheres to an "objective" law of contracts, meaning "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties [regardless] of the intent of the parties at the time they en-

---

**2.** For example, Mr. James alleged that, before the sale, his monthly mortgage payment was $940.29. He understood the deal to mean that his daughter (who was living in the home and had been unable to make the mortgage payments) could remain at the property; she would pay $1,240.29 a month to the defendants; and the defendants would then pay the monthly mortgage of $940.29 to the bank, keeping the remaining $300 as a loan payment. After signing the sales agreement, however, Mr. James and his daughter missed two payments, and they received a new notice

of foreclosure. Mr. Abell's real estate company, Modern Management, also sued Mr. James for unpaid rent. When Mr. James decided to sell his house to pay off the existing mortgage and to repay Modern Management, a title search revealed that he had transferred title to Mr. Abell.

**3.** Willie King died in July 2005. Mary King Smith, his personal representative, was substituted as a plaintiff in June 2006.

tered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake." *DSP Venture Group, Inc. v. Allen,* 830 A.2d 850, 852 (D.C.2003) (internal quotation marks and citation omitted; brackets in original). In other words, a party's unexpressed intent is irrelevant if a contract is unambiguous. *See Bolling Federal Credit Union v. Cumis Insurance Society, Inc.,* 475 A.2d 382, 385 (D.C.1984) ("If the release is facially unambiguous, we must rely solely upon its language as providing the best objective manifestation of the parties' intent."); 1 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1.9, at 25 (1993) ("Agreement consists of mutual expressions; it does not consist of harmonious intentions or states of mind.").

When interpreting a contract and determining whether it is ambiguous, "we examine the document on its face, giving the language used its plain meaning." *Tillery v. District of Columbia Contract Appeals Bd.,* 912 A.2d 1169, 1176 (D.C. 2006) (citing *Sacks v. Rothberg,* 569 A.2d 150, 154 (D.C.1990)). "[A] court must honor the intentions of the parties as reflected in the settled usage of the terms they accepted in the contract, and will not torture words to import ambiguity where" there is none. *Bragdon v. Twenty–Five Twelve Assocs. Ltd. Partnership,* 856 A.2d 1165, 1170 (D.C.2004) (internal quotation marks and citations omitted). Moreover, "contracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction." *Steele Foundations, Inc. v. Clark Construction Group, Inc.,* 937 A.2d 148, 153 (D.C.2007) (citing *Dodek v. CF 16 Corp.,* 537 A.2d 1086, 1093 (D.C.1988)).

If, however, "the court finds that the contract has more than one reasonable interpretation and therefore is ambiguous, then the court-after admitting probative extrinsic evidence-must determine what a reasonable person in the position of the parties would have thought the disputed language meant." *In re Bailey,* 883 A.2d 106, 118 (D.C.2005) (internal quotation marks omitted). In such instances, though, any ambiguity as to the contract's meaning will be construed strongly against the drafter. *See Capital City Mortgage Corp. v. Habana Village Art & Folklore, Inc.,* 747 A.2d 564, 567 (D.C.2000).

### III. Standard of Review

Determining whether documents or oral representations constitute an enforceable contract is a question of law, which this court reviews *de novo. East-Banc v. Georgetown Park Assocs.,* 940 A.2d 996, 1002 (D.C.2008) (citing *Kramer Assocs. v. Ikam, Ltd.,* 888 A.2d 247, 251 (D.C.2005)). Whether a contract is ambiguous is also a question of law subject to *de novo* review. *Steele Foundations,* 937 A.2d at 153. Similarly, we review *de novo* a trial court's interpretation of a settlement agreement. *See 1230–1250 Twenty–Third St. Condo. Unit Owners Ass'n, Inc. v. Bolandz,* 978 A.2d 1188, 1191 (D.C.2009).

### IV. The Dyer–King Settlement Agreement

#### A. The Factual and Procedural Background

On May 28, 2007, one day prior to trial, Mr. Dyer's attorney, Mr. Fisher, sent a "settlement offer" to Mr. Pariser, the attorney for the King estate, for the purpose of "settl[ing] Mr. Dyer out of the Bilaal case completely." Mr. Dyer offered the following terms:

1. The Estate of Willie King will receive title to the King house.

2. The mortgage on the King house will be paid off in full.

3. The approximately $16,000 expended to take the King house out of foreclosure will be forgiven.

4. The King estate will receive $50,000 in cash.

5. Any outstanding payments due for the King house arising out of any court orders will be forgiven.

Mr. Dyer also offered "not to conduct in the future any pre-foreclosure transactions that involve a sale and lease-back with an option to repurchase...." Dyer's attorney characterized this proposal as "a substantial new settlement offer that makes the King estate whole (by returning the King house) and considerably more (by paying off the mortgage and making a substantial cash payment), and addresses the public interest concerns of all plaintiffs with a pledge that Mr. Dyer will not engage in pre-foreclosure/lease-back/buy-back transactions in the future." Mr. Pariser accepted the offer by phone the same day.

On May 29, 2007, Mr. Pariser announced in open court that the King estate had reached a settlement with Mr. Dyer, and they had agreed that he "would read into the record ... the material terms." Mr. Pariser did so without correction from Mr. Fisher. Subsequently, the parties attempted to draft a more comprehensive written agreement but disputed whether to include a confidentiality clause and what it meant to pay off the mortgage "in full." Mr. Dyer argues that when he used the term "in full," he meant that he would pay the "principal outstanding balance." The King estate asserts that "in full" includes not only the principal but also any penalties and arrearages. After negotiations broke down, plaintiffs filed a motion to enforce the settlement agreement.

On August 3, 2007, the trial court granted the motion, holding (1) that the parties had reached an enforceable settlement agreement that did not include a confidentiality clause, and (2) that the term "[t]he mortgage will be paid off in full" was unambiguous and required Mr. Dyer to pay "all outstanding principal plus interest plus taxes plus insurance plus arrearages and late fees." In addition to appealing that judgment, Mr. Dyer also appeals the denial of his Motion for Possession, to Strike Plea of Title, and to Enter Judgment, filed on July 25, 2007, which the trial court rejected in light of its decision to enforce the settlement agreement.

## B. When Accepted, the May 28th E-mail Became an Enforceable Contract

▬ Mr. King's estate and Mr. Dyer disagree about whether their agreement to settle was an enforceable contract or merely an unenforceable "agreement to agree." Before setting out to interpret the terms of a settlement agreement, we must first ask whether the parties entered into an enforceable contract. *See Sutton v. Banner Life Insurance Co.*, 686 A.2d 1045, 1048 (D.C.1996). For a contract to be enforceable, the parties must (1) express an intent to be bound, (2) agree to all material terms, and (3) assume mutual obligations. *EastBanc*, 940 A.2d at 1002. A contract's material terms (such as subject matter, price, payment terms, and duration) must be "sufficiently definite" so that each party can be "reasonably certain" about what it is promising to do or how it is to perform. *Rosenthal v. National Produce Co.*, 573 A.2d 365, 370 (D.C.1990) (citing J.D. Calamari & J.M. Perillo, THE LAW OF CONTRACTS, § 2–13, at 43–44 & n. 17 (2d ed.1977)). Generally, parties need to express their intentions so that a court can understand them, determine whether a breach has occurred, and identify the obligations it should enforce. *Rosenthal*, 573 A.2d at 370. However, because all "agreements have some degree of indefiniteness

and some degree of uncertainty," the terms "need not be fixed with complete and perfect certainty for a contract to [be enforceable]." *EastBanc*, 940 A.2d at 1002 (citations omitted).

### 1. Intent of the Parties to be Bound

"[R]egardless of the parties' actual, subjective intentions, the ultimate issue is whether, by their choice of language ..., they *objectively* manifested a mutual intent to be bound contractually." *1836 S Street Tenants Ass'n, Inc. v. Estate of B. Battle*, 965 A.2d 832, 837 (D.C.2009). When Mr. Fisher wrote the e-mail, he stated that his purpose was "to settle Mr. Dyer out of the Bilaal case completely." The e-mail then proposed several terms for settlement. At the end of the e-mail, Mr. Fisher requested a prompt reply, because "Mr. Dyer wishe[d] to reach an agreement in principle today if at all possible." In addition to the language of the offer, its timing (the day before trial), its swift acceptance,[4] and the in-court announcement that the parties had reached an agreement also demonstrate the parties' intent to be bound by the terms set forth in the May 28, 2007, e-mail.

### 2. Mutuality of Obligation

Mutuality exists when each party agrees to do something it otherwise is under no legal obligation to do, or to refrain from doing something it has a legal right to do. *See Order of AHEPA v. Travel Consultants, Inc.*, 367 A.2d 119, 125 (D.C.1976). "An exchange of promises provides sufficient consideration, evidencing mutual obligation." *EastBanc*, 940 A.2d at 1003 (citation omitted). This requirement was satisfied. In the May 28, 2007, e-mail, Mr. Dyer undertook to pay off the mortgage on the King house and to convey title to the King estate. The plaintiffs agreed to drop Mr. Dyer from the lawsuit, allowing him to avoid trial and the prospect of greater liability.[5]

### 3. Agreement as to All Material Terms

The terms in the May 28, 2007, e-mail are definite enough to be enforceable because each party could be reasonably certain how it was to perform. *See EastBanc*, 940 A.2d at 1003 ("The enforceability of the agreement comes from the definitive character of the *obligation* to perform, not a precise description of the ways in which the obligation might be fulfilled.") (internal citation omitted). Although the e-mail did not assign an exact cost to Mr. Dyer's obligation to pay off the King mortgage "in full," it did not have to do so. *Id.* (citing *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 548 N.Y.S.2d 920, 548 N.E.2d 203, 206 (1989) (noting that "a price term is not necessarily indefinite because the agreement ... leaves fixing the amount for the future")) (internal citations omitted).

The mortgage was accruing interest, so the total amount due was in flux.[6] The trial court also noted that

---

**4.** It is undisputed that Mr. Pariser called and accepted the terms that afternoon.

**5.** Prior to Mr. Dyer's offer, a jury verdict of more than $3 million had been returned against three of the other defendants in an almost identical suit brought by the same lawyers who were representing the plaintiffs in this case. *See Wilson v. Abell, et al.*, Dock-

et No. 04–7270 (D.C.Super. Ct., jury verdict March 27, 2007).

**6.** At the May 29 hearing, Mr. Fisher and Mr. Pariser voiced different estimates of "the mortgage payout," but both treated the figure as a matter for future calculation. Neither suggested that the uncertainty meant that they had failed to reach an agreement. Moreover, Mr. Dyer's counsel certainly did not

"there were penalties, apparently occasioned by Defendant Dyer's decision not to continue the mortgage payments after Willie King and/or his heirs had failed to make some of the monthly protective order payments as directed by this court." Whether or not Mr. Dyer was justified in withholding those payments, he certainly knew (or should have known) about the resulting penalties.[7] Furthermore, when reading "in full" against the background of the underlying dispute and in the context of Mr. Dyer's e-mail, which stated he would return title to the King estate, we agree with the trial court that this "mortgage cannot be released, and title cannot pass, until all of its terms, including any penalties, are satisfied." Although it is in theory possible to pass less than full title by a quitclaim deed, Mr. Dyer pledged to return title and pay off the mortgage "in full," and we think the trial court sensibly construed the offer, as a whole, to mean that the King estate would receive title free and clear of any encumbrances.[8]

▮ Mr. Dyer also argues that there is no contract because the agreement omits the material term of a confidentiality clause. However, provisions that are "not necessary for the parties to understand how they are expected to perform the contract itself" are not material and do "not undermine the binding nature of the agreement." *Tauber v. Quan*, 938 A.2d 724, 730 (D.C.2007) (internal quotation marks and citation omitted). A case clearly may be settled without a confidentiality clause. Such a provision certainly *could* have been deemed material, but neither party referred to confidentiality in the e-mail, in the acceptance, or in open court. If confidentiality were, indeed, an indispensable part of the settlement, it is curious that Mr. Dyer's counsel stood by silently while the material terms of the agreement were stated by his opponent on the record, in open court.

▮ Mr. Dyer nevertheless claims that a confidentiality clause was implied when he stated he wished to settle out of the case "completely." This certainly is not a natural implication of the word "completely." Moreover, this argument ignores the fact that all overt references to such a provision took place after the May 29, 2007, hearing and after Mr. Dyer avoided

---

assert that the case should proceed to trial as scheduled because it had become clear that the parties disagreed about what they meant by paying the mortgage "in full."

7. Mr. Dyer contends that his "obligation to pay the mortgage ended ... [because of] months of nonpayment of rent [by Mr. King and his estate]." However, as the trial court noted, even after the plaintiffs renewed the payments, pursuant to a protective order, Mr. Dyer "did not seek to have this court release to him the payments King and his estate had made into the registry of the court for Dyer to use to make the mortgage payments."

8. We reject Mr. Dyer's argument that there was no contract because the parties made a mutual mistake of fact. To establish a mutual mistake of fact, it is not enough simply to establish that the parties disagree on a term's meaning; both parties must have believed an extrinsic fact to be true, when, in fact, it was not. *See Isaac v. First National Bank of Maryland, D.C.*, 647 A.2d 1159, 1162 n. 8 (D.C. 1994) (discussing mutual mistake as a ground for rescinding a contract). Whether "in full" means principal outstanding balance or principal outstanding balance plus arrearages, is a dispute over the meaning of a provision, not a mutual mistake about an extrinsic fact. Indeed, especially when he discusses his own "gross underestimation of the correct amount of the Willie King/King Estate rent arrearages," appellant seems at times to be invoking the doctrine of "unilateral mistake." He has not come close to meeting the stringent requirements for avoiding a contract under that doctrine. *See generally Tauber v. Quan*, 938 A.2d 724, 731–32 (D.C.2007).

trial. Under Mr. Dyer's theory, he could always avoid his legal obligations by later claiming he meant to include a term that he previously failed to mention.[9]

■ Finally, we are unpersuaded by Mr. Dyer's argument that the agreement is void because restricting his ability to engage in the sale/leaseback/option-to-repurchase business places undue restraints on the disposition of property and is contrary to public policy. It was Mr. Dyer who affirmatively offered "not to conduct in the future any pre-foreclosure transactions that involve a sale and lease-back with an option to repurchase" in his May 28, 2007, e-mail, touting it as "a pledge" that "addresses the public interest concerns of all plaintiffs." Although we have, on occasion, refused to enforce a contract on public policy grounds, this is not such a case.[10]

## C. Appellant Dyer Was Not Entitled To an Evidentiary Hearing

■ Mr. Dyer also asserts that the trial court should have held an evidentiary hearing to determine what each party understood the terms "in full" and "completely" to mean and whether he was acting under duress when he offered the settlement terms. Mr. Dyer cites four cases to support his first request, but his reliance is misplaced because in each of those cases, the alleged contract was based on oral statements made out of court.[11] By contrast, here the terms of the offer were set forth in writing and Mr. Pariser also announced them in court on the record. There is no dispute about what was said between the parties. As demonstrated above, we can interpret the agreement without resort to extrinsic evidence. Indeed, the objective law of contracts requires us to avoid considering extrinsic evidence in the absence of ambiguity.

9. Mr. Dyer asserts as well that the parties only reached an "agreement to agree" because they contemplated drafting a comprehensive settlement document after the May 29, 2007, hearing. However, "[e]ven if the parties intend to subsequently enter into a written contract, as was indisputably the case here, it does not necessarily follow that they have not made any contract until the writing is completed and signed." *Jack Baker, Inc. v. Office Space Development Corp.,* 664 A.2d 1236, 1238 (D.C.1995). Moreover, failing to agree upon the form and terms of a memorial does not invalidate an enforceable contract previously made between parties. *See 1836 S Street Tenants Ass'n, Inc.,* 965 A.2d at 839 (if the contract contained all material terms, "the bargain is enforceable even if the parties never reach agreement on the non-material terms."); *Hackney v. Morelite Construction,* 418 A.2d 1062, 1068–69 (D.C.1980) (" '[T]he mere fact that a contract, definite in material respects, contains some terms which are subject to further negotiation . . . will not bar a decree for specific performance.' " (quoting *Ammerman v. City Stores Co.,* 129 U.S.App. D.C. 325, 330, 394 F.2d 950, 955 (1968))).

10. This agreement does not preclude Mr. Dyer from earning a living as a real estate investor, and we are confident that his inability to engage in sale/lease-back transactions will not negatively impact consumers in the market for home refinancing. *Cf., e.g., Deutsch v. Barsky,* 795 A.2d 669, 674–76 (D.C. 2002) (covenant not to compete), and *Ellis v. James V. Hurson Assocs., Inc.,* 565 A.2d 615, 618 (D.C.1989) (restrictions on post-employment competition).

11. *Autera v. Robinson,* 136 U.S.App. D.C. 216, 217, 419 F.2d 1197, 1198 (1969) (dispute about whether there was an oral agreement to settle the case); *Brown v. Brown,* 343 A.2d 59, 61 (D.C.1975) (recognizing "that an oral settlement which otherwise conforms to general contract law is enforceable"); *Boks v. Charles E. Smith Management, Inc.,* 453 A.2d 113, 118 (D.C.1982) (appellant "contends that she had never made a promise or an offer to dismiss her case, nor entered into any agreement to do so"); and *Jack Baker, Inc. v. Office Space Development Corp.,* 664 A.2d 1236, 1238 (D.C.1995) ("JBI's alleged breach of contract rights must depend upon its proof of an enforceable oral agreement").

*1010 Potomac Assocs. v. Grocery Manufacturers of America, Inc.,* 485 A.2d 199, 205 (D.C.1984) ("Extrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous.").

■ It was likewise unnecessary to hold a hearing to determine whether Mr. Dyer settled under duress due to his fear of losing at trial. He may now regret having settled, but the excuses he offers simply do not meet the legal test for duress. "[D]uress is 'any wrongful threat of one person by words or other conduct that induces another to enter a transaction under the influence of such fear as precludes him from exercising free will and judgment....'" *Sind v. Pollin,* 356 A.2d 653, 656 (D.C.1976) (quoting RESTATEMENT OF CONTRACTS § 492 (1932)). We are not prepared to say that Mr. Dyer's assessment of the courtroom prowess of plaintiffs' counsel, his "mounting weariness, frustration, and confusion over this 2–year litigation," or his "dismay" precluded him from exercising free will and judgment. "[A]ll defendants considering settlement do so based upon consideration of the adverse consequences that might result if the action proceeds and they do not prevail on the merits." *American Security Vanlines, Inc. v. Gallagher,* 251 U.S.App. D.C. 198, 203, 782 F.2d 1056, 1061 (1986) (quotation from attached opinion of the district court). Because the factors Mr. Dyer points to

could not legally amount to duress, there was no need to hold an evidentiary hearing on that issue. *See Sind v. Pollin,* 356 A.2d at 657 (upholding grant of summary judgment; "appellant's factual allegations and theory of economic coercion do not constitute duress as a matter of law"); *cf. United States v. Jenrette,* 240 U.S.App. D.C. 193, 197, 744 F.2d 817, 821 (1984) ("Where [ ] the evidence is insufficient as a matter of law to support a finding of duress, the district court's refusal to instruct the jury on duress is not erroneous.") [12]

In sum, we find no legal error in the trial court's decision to enforce the settlement agreement. Furthermore, because the case had been settled, and Mr. Dyer had agreed to return title to the King estate, the court properly denied his Motion for Possession, to Strike Plea of Title, and to Enter Judgment.

## V. The Abell–James Settlement Agreement

### A. The Factual and Procedural Background

After Mr. Dyer and the estate of Mr. King announced their settlement, the remaining parties agreed to settle as well. On August 23, 2007, plaintiffs (including Mr. James) and defendants (including Mr. Abell, Modern Management, and Ms. Bartola) signed a settlement agreement and release, acknowledging that it "represents

---

**12.** As part of his duress claim, Mr. Dyer asserts that he had "no practical alternative but to settle" because the failure of King and his estate to pay rent and their pending plea of title coerced him into believing that the "Lease Agreement ... was to no effect" and that "possession of the property seemed destined to remain in the hands of Appellees." Neither these allegations nor his complaint that Legal Counsel for the Elderly acted wrongfully by making some rent payments on behalf of the estate into the registry of the court are sufficient to raise a cognizable claim of duress.

Throughout his brief, Mr. Dyer defends his own conduct and complains about the failure of King and his estate to pay rent, asserting, for example, that King "repudiated his contract under the Lease Agreement by failing to pay rent for 11 months and thereby absolved Appellant of his obligations to pay the mortgage." Simply put, such protests are now beside the point. By agreeing to settle this litigation, Mr. Dyer gave up the right to seek vindication on these or other grounds.

a fully binding and complete settlement...." Plaintiffs and defendants agreed to "completely release and forever discharge [one another] from any and all past, present, or future claims," which each person had at signing or "which may hereafter accrue or otherwise be acquired as a result of ... any and all known or unknown claims by [each party] ... for any injury or claim for compensation of any nature whatsoever...." In addition, both plaintiffs and defendants "expressly waive[d] and assume[d] the risk of any and all claims they ha[d] or may have [had] against" each other for damages at that point.

Defendants also specifically agreed to "forgive any requests, demands or claims for payments owing or allegedly owing to Defendants from Mr. James in relation to [his former home]." They further agreed to pay plaintiffs $395,000, $140,000 of which was to go to Mr. James, "with payment to be completed on or before December 31, 2007 as specified in Paragraph 12 herein." Paragraph 12 provided, among other things, that all payments "shall be delivered by hand, or by Federal Express or a similar delivery service offering a tracking service, to Jeffrey Pariser," plaintiffs' counsel.

To help satisfy defendants' obligations under the agreement, Mr. Abell listed and sold Mr. James' former home. At that point, the defendants discovered that a personal judgment against Mr. James for $10,263.75 had been recorded as a lien against the property on October 6, 2000. With interest, it totaled $30,981.77. Mr. Abell paid that sum to release the lien and then sold the property. Subsequently, defendants deducted the $30,981.77 from what they owed and paid Mr. James $109,018.23 instead of $140,000.

In response, plaintiffs filed a motion to enforce the settlement agreement. The trial court denied the motion, concluding that the agreement "contemplated Defendants relieving James of financial liability related to his mortgage and did not envision Defendants assuming responsibility for liens securing personal judgments against him."

## B. The Abell–James Settlement Agreement Was Unambiguous

■ Neither Mr. Abell nor Mr. James disputes that the settlement agreement was a binding contract. Instead, they disagree about whether the terms of their agreement were ambiguous and whether a court may consider extrinsic evidence in construing its provisions. As previously discussed, because we follow the "objective" law of contracts, we will not inquire beyond contractual terms unless the language of the agreement is ambiguous. *See Akassy v. William Penn Apartments Ltd.*, 891 A.2d 291, 303 (D.C.2006). In other words, absent ambiguity, we enforce written contracts according to their terms. *See Sutton*, 686 A.2d at 1048; *Saslaw v. Rosenfeld*, 148 A.2d 311, 312 (D.C. 1959) ("The construction of a release is governed by the intent of the parties as manifested in the language of the instrument."). A contract "is not ambiguous where the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." *Burbridge v. Howard Univ.*, 305 A.2d 245, 247 (D.C.1973) (citing 17A C.J.S. *Contracts* § 294, at 34–35 (1963)).

■ The Superior Court erred by not enforcing the settlement agreement, which unambiguously required Mr. Abell and Modern Management to deliver $140,000 to Mr. James' counsel. Pursuant to the objective theory of contract law, we hold parties to the promises they articulate, without attempting to discern their unexpressed intentions. *Bolling*

*Federal Credit Union,* 475 A.2d at 385 ("The language of the release is sufficiently clear to preclude, under parol evidence principles, the use of extrinsic evidence to probe the parties' intentions."). Accordingly, it is not relevant whether the parties contemplated defendants having to pay to discharge a lien based on a personal judgment. Defendants agreed in plain language to deliver $140,000 to Mr. James' counsel. This situation is not conceptually different than if the house had sold for less than anticipated. Under the terms of the settlement agreement, Mr. Abell would still owe $140,000.

### C. The Equities Do Not Weigh Against Mr. James

■■■■ Even if they were relevant, the equities in this case would not weigh against enforcing the agreement according to its plain language. First, defendants' argument that they did not know about the lien ignores the rule that a purchaser of real property is deemed to have constructive notice of all properly recorded encumbrances relating to that property. *Stuart v. American Security Bank & National Permanent Federal Savings & Loan Ass'n,* 494 A.2d 1333, 1338 (D.C.1985). Because Bank of America recorded the lien in the District of Columbia property records in 2000, defendants had the ability to conduct, and ran the risks of not conducting, a title search. *Anderson v. Reid,* 14 App. D.C. 54, 68 (1899) ("Public records give constructive notice of their contents," and by failing to review those records, individuals "incur the liability of shutting their eyes to the facts which they might have discovered upon examination.").[13]

The defendants are real estate professionals and should be well aware of the rules and procedures regarding title searches.

Second, under the agreement, Mr. Abell relinquished his right to offset the amount he paid to remove the personal judgment lien on Mr. James' property. In theory, Mr. Abell could have fulfilled his contractual duties (paid Mr. James $140,000) and then brought an action seeking indemnification, or claiming unjust enrichment, under his theory that the contract did not cover obligations "to a third party in relation to a personal judgment." As explained in more detail above, however, defendants executed very broad releases of plaintiffs from "any past, present or future claims. . . ." They therefore surrendered any claim for indemnification or unjust enrichment. By the clear terms of the settlement agreement, defendants still owe Mr. James the difference between $140,000.00 and what they have thus far paid.

### VI. Conclusion

For the reasons stated, we affirm the judgment of the Superior Court enforcing the settlement agreement against Mr. Dyer (No. 07–CV–1057) as well as the judgments on appeal in No. 08–CV–1562 and No. 09–CV–76. See note 1, *supra.* We reverse the judgment in No. 08–CV–23 and remand with instructions to enforce the separate settlement agreement against Mr. Abell and Modern Management.

*So ordered.*

---

**13.** We reject defendants' argument that they did not conduct a title search because, lacking time to do so before the impending foreclosure, they justifiably relied on Mr. James' silence instead. Although they may not have had time to examine property records prior to "purchasing" the home in 2004, they certainly had the opportunity to do so during the intervening three years before they signed the settlement agreement. And Mr. James claims he did not comment on the financial condition of his property before he transferred title because he was not aware that he was selling his home.