# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 6, 2023                    Decided June 21, 2024

No. 22-7057

APPRIO, INC.,
APPELLEE

v.

NEIL ZACCARI,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-02180)

———

*Gregory W. Keenan*, pro hac vice, argued the cause for appellant. On the brief were *Belinda D. Jones*, *Robert D. Michaux*, *Andrew B. Grimm*, and *Kirk T. Schroder*.

*John R. Hutchins* argued the cause for appellee. With him on the brief were *Christopher B. Roth* and *William Rauchholz*.

Before: WILKINS and WALKER, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

2

WILKINS, *Circuit Judge*: This case concerns the enforceability of a contract that was digitally "acknowledged" but not explicitly "agreed" to. Between 2015 and 2017, Appellee Apprio, Inc. ("Apprio"), a government contractor in the business of helping clients automate and streamline operations, employed Appellant Neil Zaccari ("Zaccari") as a Senior Technical Manager responsible, in part, for technology development. Prior to his employment with Apprio, Zaccari, incidentally, had developed a regulatory compliance software (the "Initial Software"). During his tenure, Zaccari realized that his Initial Software might be helpful to Apprio, so he updated the Initial Software to create a new version: the Updated Software. Zaccari then brought the Updated Software to work and demonstrated it to both his colleagues and one of Apprio's clients. Apparently impressed by the Updated Software, Apprio asked Zaccari to hand it over. Zaccari obliged.

The next month, Apprio sent Zaccari a document titled "Proprietary Information and Assignment of Inventions Agreement" (the "Agreement"). The Agreement included provisions relevant to copyright assignment of the Updated Software. Zaccari accessed the Agreement through Apprio's human resources portal and admits that he both saw the document and had the opportunity to read it. Zaccari then closed the document by clicking on the "only option" he says he saw on the computer screen: a button that read "Acknowledge." J.A. 923.

Nearly a year later, Apprio fired Zaccari. Following his termination, Apprio requested Zaccari furnish all copies of the Updated Software in his possession. Zaccari refused to do so, and he instead copyrighted the Updated Software and sued Apprio for breaching the Agreement when Apprio allegedly forced him to turn over a copy of the Updated Software to an

3

Apprio client. In response, Apprio filed this case, countersuing Zaccari for breaching the Agreement when he refused to assign his rights in the Updated Software to Apprio (among other attendant actions). The District Court combined the cases, dismissed Zaccari's case for failure to state a claim, and in Apprio's case, initially granted partial summary judgment for Apprio with respect to contractual assignment of rights in the Updated Software and later also granted full summary judgment for Apprio on its breach of contract claim.

Zaccari now appeals, arguing that the Agreement is not an enforceable contract and, in the alternative, that the Agreement neither supports the assignment of his rights in the Updated Software to Apprio nor a finding that he breached the Agreement. We disagree on all fronts. We hold that Zaccari's "acknowledgment" of the Agreement created an enforceable contract that requires Zaccari to assign his rights in the Updated Software to Apprio. Accordingly, Zaccari breached the binding Agreement by failing to assign those rights to Apprio and disclosing the Updated Software's underlying code to the U.S. Copyright Office ("Copyright Office") in order to obtain the copyright. For these reasons, we affirm the District Court.

## I.

### A.

Zaccari was employed at Apprio as a Senior Technical Manager between November 2015 and May 2017. While Zaccari worked there, Apprio was under contract with the Defense Contract Management Agency ("DCMA") to help the agency receive and review contracts more efficiently by developing, testing, and implementing automation tools. As relevant here, Zaccari was hired to work in a group specifically "charged with making recommendations for improving, among

other things, the DCMA's contract receipt and review process." *Id.* at 922.

In 2008, prior to his employment at Apprio, Zaccari independently developed the Initial Software. The Initial Software is a regulatory compliance program that automates the generation of Microsoft Excel reports on key search terms. It works by allowing users to "set out regulatory compliance provisions," which the computer then uses to "search an uploaded document for key terms related to that provision," and then "create[] a report that list[s] the key terms . . . [with] the page, line number, and associated regulatory provision for each mention of the key terms." *Id.* at 921.

In 2016, upon realizing that his software could be useful to Apprio for "efficiently implement[ing] contract review" and "automat[ing] contract receipt and review processes[,]" Zaccari updated the Initial Software on his own time and equipment. *Id.* at 570–71. To accomplish this update, Zaccari made what he calls "superficial or very simple" changes, like "updat[ing] the code to allow a user to directly upload a [.]pdf file, rather than only a Word document" and other changes to "make the program compatible with newer versions of Microsoft Excel." *Id.* at 922. The "base code [that] contain[ed] the keyword lookup and the keyword search engine," however, was left untouched. *Id.* at 922.

These changes resulted in the Updated Software—a new version of the program. The Updated Software had "10 additional functions" and was realized from changing "[m]ore than half of the [underlying] code" from the Initial Software. J.A. 1754. After finishing the update, Zaccari brought the Updated Software to work to "show . . . [his] colleagues and a senior level government employee at DCMA." *Id.* at 923. He additionally "informed Apprio that he could use the existing

capabilities of [the software he had developed] to automate the DCMA's manual contract receipt and review process." *Id.* at 699.

While some of the facts concerning what came next are disputed, the parties agree that, shortly after Zaccari's demonstration at work, Apprio asked Zaccari for the Updated Software and Zaccari provided it. Apprio then turned the Updated Software over to DCMA, which in turn deployed it to its own employees for use.

About a month after Zaccari's demonstration, in June 2016, Apprio sent Zaccari the Agreement through the company's human resources portal. Zaccari logged into the portal, "clicked a link and proceeded to the [Agreement] document." *Id.* at 923. The document included three provisions relevant here:

> **2.2 Prior Inventions**[:] Inventions . . . which I made prior to the commencement of My Service are excluded from the scope of this Agreement and all inventions which I made prior to the commencement of My Service will be governed by assignment agreements I executed prior to the date hereof. To preclude any possible uncertainty, I have set forth on a Previous Inventions Disclosure Form . . . a complete list of all Inventions that I have, alone or jointly with others, conceived, developed or reduced to practice or caused to be conceived, developed or reduced to practice prior to the commencement of My Service, and that I both (a) may use in connection with My Service and (b) consider to be my property . . . and that I wish to have excluded from the scope of this

Agreement . . . . [Additionally,] Prior Inventions shall not include inventions that I have developed or reduced to practice or caused to be conceived, developed or reduced to practice prior to the commencement of My Service if I do not use such inventions in connection with My Service . . . . If no such disclosure is made, I represent that there are no Prior Inventions. If, in the course of My Service, I incorporate a Prior Invention into a Company product, process or machine, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, modify, use and sell such Prior Invention. Notwithstanding the foregoing, I agree that I will not incorporate, or permit to be incorporated, Prior Inventions in any Company Inventions without the prior written consent of an authorized officer of the Company.

**2.3 Assignment of Inventions**[:] Subject to Section[] 2.4 . . . I hereby assign and agree to assign in the future . . . to the Company all my right, title and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto) whether or not patentable or registrable under copyright or similar statutes, made or conceived or reduced to practice or learned by me . . . during the period of My Service[] . . . .

> **2.4 Unassigned Inventions**[**:**] I recognize that this Agreement will not be deemed to require assignment of any invention that was developed entirely on my own time without the Company's equipment, supplies, facilities, or trade secrets and neither related to the Company's actual or anticipated business, research or development, nor resulted from work performed by me for the Company.

*Id.* at 130–31. The Agreement also included a preamble that read "I hereby agree as set forth herein," *id.* at 130, and a conclusion that stated, in relevant part, "I acknowledge and agree that the language herein shall be deemed to be approved by all parties hereto . . . and that I have had an opportunity to consult with an attorney regarding the terms herein prior to signing this Agreement," *id.* at 133.

Zaccari admits to opening this document, to having had the opportunity to read it, and to then clicking the "Acknowledge" button, which he says was the "only option on the computer screen" available for closing the window. *Id.* at 923. Zaccari did not subsequently submit any Previous Inventions Disclosure Forms as directed by the Prior Inventions provision of the Agreement, but also claims he both "was . . . never told that 'agreeing' to the document was a condition of [his] employment" and "didn't understand [him]self to be signing a contract that would bind [him]." *Id.*

In May 2017—nearly a year after Zaccari received the Agreement—Apprio terminated Zaccari. Thereafter, Zaccari refused Apprio's requests to furnish all copies of the Updated Software in his possession. Instead, Zaccari copyrighted the Updated Software in 2018 using a "One Work by One Author" application, wherein he disclosed the entirety of the source

code for the software and asserted that the software was completed in 2016 (during his employment at Apprio), before suing Apprio.

**B.**

Zaccari's central claim in his suit was that Apprio breached the Agreement by forcing him to turn over a copy of the Updated Software. *See Zaccari v. Apprio, Inc.* (*Zaccari I*), No. 18-cv-1560 (D.D.C. Jun. 29, 2018). In that case, Zaccari admitted that he had "entered into the . . . Agreement," J.A. 594, and had "agreed to assign any rights in or to his work product to Apprio 'during [his] employment or engagement as an independent contractor by [Apprio],'" *id.* at 588 (quoting the Agreement).

While *Zaccari I* was pending, Apprio filed this case. The company alleged Zaccari breached the Agreement when he failed to "assign any rights he [claims]" in the Updated Software. *Id.* at 31. The District Court consolidated *Zaccari I* with the instant case and then stayed this case before addressing *Zaccari I* first.

The District Court then dismissed *Zaccari I* on the grounds that Zaccari had failed to state a breach of contract claim. *Zaccari v. Apprio Inc.*, 390 F. Supp. 3d 103, 110 (D.D.C. 2019). The District Court then proceeded with this case, ruling in Apprio's favor in two judgments. *See Apprio, Inc. v. Zaccari* (*Apprio I*), 2021 WL 2209404 (D.D.C. Jun. 1, 2021); *Apprio Inc. v. Zaccari* (*Apprio II*), 2022 WL 971001 (D.D.C. Mar. 31, 2022). Applying District of Columbia law as specified in the Agreement, the District Court first granted Apprio partial summary judgment as to the contractual assignment of rights on the grounds that the Agreement was binding and required Zaccari to assign his rights in the Updated Software to Apprio. *Apprio I*, 2021 WL 2209404, at *4–*6, *12. Second, after

dismissing Zaccari's intervening motions for reconsideration and for an order directing entry of final judgment under Rule 54(b), the District Court granted Apprio summary judgment on its breach of contract claim. *Apprio II*, 2022 WL 971001, at *1.

Zaccari now appeals the District Court's partial summary judgment, summary judgment, and reconsideration rulings. We have jurisdiction over each under 28 U.S.C. § 1291. We review the grant of partial and full summary judgment *de novo*, *Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1231 (D.C. Cir. 2023); *Klayman v. Judicial Watch, Inc.*, 6 F.4th 1301, 1314 (D.C. Cir. 2021), and the denial of the motion for reconsideration for abuse of discretion, *CostCommand, LLC v. WH Administrators, Inc.*, 820 F.3d 19, 23 (D.C. Cir. 2016).

**II.**

As relevant here, the District Court made two holdings. It first held in its partial summary judgment decision that Zaccari's "acknowledgment" of the Agreement created a binding contract that required Zaccari to assign all of his rights in the Updated Software to Apprio. *Apprio I*, 2021 WL 2209404, at *6. Second, after denying Zaccari's motion for reconsideration of the partial summary judgment decision, the District Court held on summary judgment that Zaccari had breached three provisions of the Agreement. For one, it held that Zaccari breached Section 1.1, which restricts disclosing, using, or publishing Apprio's proprietary information, by submitting a copyright application for the Updated Software that included proprietary information on the program without Apprio's authorization. *Apprio II*, 2022 WL 971001, at *10–*11. For another, the District Court held that in refusing Apprio's request that Zaccari execute a confirmatory assignment to Apprio for the Updated Software, Zaccari

breached Section 2.8 of the Agreement, which requires the signer to "assist [Apprio] in every proper way to obtain, and . . . enforce, United States and foreign Proprietary Rights relating to Company Inventions" and "execute, verify and deliver such documents and perform such other acts" as Apprio "reasonably requests" to "obtain[]" or "perfect[]" the assignment of rights over Apprio's inventions. *Id.* at *12. And finally, it held Zaccari breached Section 7, which required Zaccari to "deliver to [Apprio] . . . any other material containing or disclosing any Company Inventions . . . or Proprietary Information of [Apprio]" at the end of his employment, by retaining copies of the Updated Software after his termination. *Id.* We agree.

## A.

### 1.

"For an enforceable contract to exist, the court must not only determine that there was an agreement to all material terms, but also that the parties intended to be bound." *Duffy v. Duffy*, 881 A.2d 630, 636–37 (D.C. 2005). District of Columbia law "adheres to an 'objective' law of contracts," which means that "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties [regardless] of the intent of the parties at the time they entered into the contract,"—that is, "unless the written language is not susceptible of a clear and definite undertaking or unless there is fraud, duress, or mutual mistake." *Dyer v. Bilaal*, 983 A.2d 349, 354–55 (D.C. 2009) (quoting *DSP Venture Grp., Inc. v. Allen*, 830 A.2d 850, 852 (D.C. 2003)). In practice, intent to be bound, "[m]utual assent," or "meeting of the minds," as to a contract, is "most clearly evidenced by the terms of a signed agreement," but the "absence of one party's signature on the written agreement will not defeat or invalidate the contract" if assent may otherwise be shown "by

the conduct of the parties." *Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995). Indeed, since the "ultimate issue" when it comes to mutual assent is whether the parties "objectively manifested" their intent "to be bound contractually," *Dyer*, 983 A.2d at 357 (quoting *1836 S. St. Tenants Ass'n v. Estate of B. Battle*, 965 A.2d 832, 837 (D.C. 2009)), "[t]he intentions of parties to a contract can be found from written materials, oral expressions and the actions of the parties" as well, if needed beyond the written language of the contract, *Duffy*, 881 A.2d at 637.

Since Zaccari does not challenge the enforceability of the Agreement for lack of an "agreement to all material terms," *id.* at 636, the only relevant question for determining whether Zaccari's "acknowledgment" of the Agreement formed a contract is whether the parties intended to be bound—and for two reasons, the answer is yes. First, Zaccari's "acknowledgment" is a signature for contractual purposes. The Electronic Signatures in Global and National Commerce Act ("E-Sign Act") provides that in "any transaction in or affecting interstate or foreign commerce," a "signature, contract, or other record relating to such transaction may not be denied legal effect . . . solely because an electronic signature or electronic record was used in its formation." 15 U.S.C. § 7001(a). As relevant here, the E-Sign Act also defines an "electronic signature" as "an electric sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record." *Id.* § 7006(5). Here, when Zaccari clicked the "Acknowledge" button, he engaged an "electric . . . process" that was "attached to or logically associated with" the Agreement and that falls within the expansive statutory definition of a signature. *See id.* As the District Court

concluded, Zaccari's admission that he intended to click the "Acknowledge" button is necessarily also an admission that he intended to sign the Agreement, *see Apprio II*, 2022 WL 971001, at *8; his engagement in that "electric process" is an "objective[] manifest[ation]" of his intent to be bound, *Dyer*, 983 A.2d at 357. Moreover, as a matter of common sense, Zaccari's "acknowledgment" is meaningful evidence of his intent to be bound in this particular circumstance because clicking a button in this manner is a common method of contractual acceptance in the world of clickwrap software contracts—the kind of contract Zaccari could reasonably be expected to be familiar with given his substantial background in computer programming.

Second, even if Zaccari had not signed the Agreement, his conduct otherwise evinces assent. *See Davis*, 664 A.2d at 838. Most notably, his decision to file *Zaccari I* to *enforce* the Agreement demonstrates that he considered the Agreement to be binding. Further, his admissions in the proceedings below that the Agreement is a contract belie his position on appeal. For example, Zaccari directly admitted in his amended answer to Apprio's complaint that "Apprio and Zaccari entered into the Agreement" and that the Agreement is "a valid contract supported by consideration." J.A. 700; *see id.* at 30. Zaccari also admitted that "he was bound to the Apprio Agreement" in his objections and responses to Apprio's First Requests for Admissions. *Id.* at 565.

**2.**

Zaccari's objections are summarily unavailing. As an initial matter, his suggestion that the Agreement was a company policy rather than a contract is upended by, among other elements, the plain text of the opening and closing

paragraphs of the Agreement. The preamble—which would have been immediately visible to Zaccari upon opening the document—clearly states, "I hereby agree as set forth herein." *Id.* at 130. The conclusion, which Zaccari concedes he had the opportunity to read even if he chose not to, reiterates, "I acknowledge and agree that the language herein shall be deemed to be approved by all parties hereto." *Id.* at 133. Zaccari cites no authority to justify this alleged distinction between company policy and contract, leaving the Court only with these terms that typically indicate a contract.

Next, Zaccari's attempt to invalidate his assent to the Agreement through a manufactured distinction between his "acknowledgment" and an agreement splits hairs. The law is clear that the word "accept" is not necessary to the formation of a contract, and Apprio presents numerous examples of admissions and conduct that show Zaccari understood that he was bound by the Agreement. And his contention that the contract was not formed because "he did not read Section 11.9" is patently absurd. As a general rule "one who signs a contract has a duty to read it and is obligated according to its terms." *Pyles v. HSBC Bank USA, N.A.*, 172 A.3d 903, 907 (D.C. 2017) (quoting *PersTravel, Inc. v. Canal Square Assocs.*, 804 A.2d 1108, 1110 (D.C. 2002)). Accordingly, "absent fraud or mistake, one who signs a contract is bound by a contract which he has an opportunity to read whether he does so or not." *Id.* (quoting *PersTravel, Inc.*, 804 A.2d at 1110). Zaccari had the opportunity to read the Agreement when it appeared on his screen. He also does not allege that he "had no other choice than to sign at that point," *Pyles*, 172 A.3d at 907, only that the only button available on the human resources portal read "Acknowledge." Zaccari reasonably should have known that another option—closing the program—was available to him,

but instead he clicked the "Acknowledge" button and manifested an acceptance that he now clearly regrets.

Third, the statute of frauds defense Zaccari raises to assert that his "acknowledgment" is an invalid signature is foreclosed by *Anchorage-Hynning & Co. v. Moringiello*. 697 F.2d 356 (D.C. Cir. 1983). In that case, a prospective buyer in a real estate transaction stopped responding to a seller at the eleventh hour following extensive negotiations between the parties. *Id.* at 358. As part of the parties' negotiations, the seller drafted a proposed contract that it presented to the prospective buyer, who deemed it "completed and satisfactory." *Id.* When it became clear that the prospective buyer was not coming back to close the deal, the seller filed suit. *Id.* at 359. The prospective buyer raised a statute of frauds defense but also admitted that he had met with the seller to negotiate a sale and that he had been satisfied by the final contract draft. *Id.* In light of these admissions, the seller filed a request for admissions, seeking concessions that showed the parties had an oral agreement, but received no response. *Id.* at 359–60. The district court then ruled for the ever-vanishing prospective buyer on summary judgment but this Court, applying District of Columbia law, reversed on the grounds that "a defendant waives the protection of the statute of frauds, and hence is barred from asserting it defensively, by admitting during the course of discovery either the making of the contract or facts sufficient to establish its existence." *Id.* at 362. So too here. Zaccari's admissions conceding his understanding that the Agreement was binding mean that he cannot raise a statute of frauds defense now that a determination that the Agreement is valid is no longer in his interest.

15

**B.**

We now turn to whether the Agreement bound Zaccari to assign all rights in the Updated Software to Apprio.

**1.**

"Copyright first 'subsists' when an author 'fix[es]' a work 'in any tangible medium of expression.'" *Valancourt Books*, 82 F.4th at 1232 (quoting 17 U.S.C. § 102(a)). The creation of the work, then, is the operative moment for determining whether copyright has been gained, as copyright protection is "both instant and automatic," in that it "vests as soon as a work is captured in a tangible form, triggering a panoply of exclusive rights that can last over a century." *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 275 (2020). Thereafter, under the Copyright Act, "each version [of the work] constitutes a separate work." 17 U.S.C. § 101.

In light of this standard and the plain text of the Agreement, the District Court correctly interpreted this relatively straightforward Agreement. The Assignment of Inventions provision plainly assigns to Apprio all "right, title and interest in and to any and all Inventions" an employee makes, conceives of or reduces to practice "during the period of [their] Service" with Apprio. J.A. 131. Zaccari concedes that he created the Updated Software during his time at Apprio. The Updated Software, accordingly, is covered by this provision as a subsequent version of the Initial Software that plainly stands alone as "a separate work." 17 U.S.C. § 101.

The District Court was also correct that none of the exceptions in the Prior Inventions provision or the Unassigned Inventions provision exempt Zaccari's creations from the Assignment of Inventions provision of the Agreement. The Prior Inventions provision says that, in order to exclude an

invention from the scope of the Agreement, the signatory is required to

> set forth on a Previous Inventions Disclosure Form . . . a complete list of all Inventions that [they] have . . . developed . . . prior to the commencement of [their] Service, and that [they] both (a) may use in connection with [their] Service and (b) consider to be [their] property.

J.A. 130. Importantly, that provision also states that "[i]f no such disclosure is made, [the signatory] represents that there are no Prior Inventions." *Id.* at 131. Accordingly, the only way to exclude a prior invention from the scope of the Agreement without a disclosure form is if the relevant invention developed "prior to the commencement" of an employee's service is "not use[d] . . . in connection with [their] Service." *Id.* at 130. Zaccari did not disclose the Initial Software. By the terms of the Agreement, his omission equates to a representation that the Initial Software is not an exempted prior invention. Zaccari also used the Initial Software in connection with his service when he used it to create the Updated Software that he then brought to work to share with his colleagues and DCMA—an Apprio client Zaccari would not have had any relationship with but for his position as an Apprio employee. For these reasons, the Prior Inventions provision does not exclude the Initial Software from the scope of the Agreement.

The Updated Software is similarly not exempted through the Unassigned Inventions provision. That provision directs that the Assignment of Inventions provision does not apply to inventions "that [were] developed entirely on [the employee's] own time without using the Company's equipment, supplies, facilities, or trade secrets and neither related to the Company's actual or anticipated business, research or development, nor

resulted from work performed by [the employee] for the Company." *Id.* at 131. Even though Zaccari created the Updated Software on his own time and equipment, its purpose and function show that it is unquestionably related to Apprio's actual "business, research [and] development" with DCMA. Indeed, this alignment is what motivated Zaccari to bring the Updated Software to his office for a demonstration before his colleagues and a DCMA representative in the first place. To conclude otherwise would require ignoring the basic facts in the record.

**2.**

Zaccari protests this conclusion with an assertion that, even if the Agreement is a binding contract, it did not effectively assign his copyright in the Updated Software to Apprio. In support, Zaccari posits that (1) the Assignment of Inventions provision cannot apply to any portion of the Updated Software that replicates any element of the Initial Software; (2) the Prior Inventions provision cannot assign his rights in the Updated Software because it is a license provision rather than an assignment provision; and (3) the Unassigned Inventions provision should be read to protect his rights in both versions of the software because the four criteria in that provision mirror the language of certain state labor statutes that are designed to "*limit*[] employer claims to employee intellectual property." Appellant's Br. 25 (emphasis in original). In addition to these three main points, Zaccari also contends that each provision should be construed in his favor because they are, in one manner or another, ambiguous.

Despite Zaccari's creative engagement with this issue, the Court cannot entertain a number of his arguments because they have been forfeited. "It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal." *Huron v. Cobert*, 809 F.3d 1274, 1280

(D.C. Cir. 2016) (quoting *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984)). This applies equally to issues and arguments; "absent exceptional circumstances, a party forfeits an argument by failing to press it in district court." *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019). Moreover, "[a] party forfeits an argument by mentioning it only 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'" *Id.* (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)); *see also District of Columbia v. Straus*, 590 F.3d 898, 903 (D.C. Cir. 2010).

Accordingly, Zaccari's Assignment of Inventions provision objections cannot be heard on appeal. Zaccari specifically argues that the Assignment of Inventions provision does not require that he turn over any portion of the Updated Software that replicates any portion of code from the Initial Software because the Updated Software is a derivative work, which the Copyright Act defines as a "work based upon one or more preexisting works," 17 U.S.C. § 101, that only allows for transfer of copyright in "the material contributed by the author of [the derivative] work" and not "any exclusive right in the preexisting material," *id.* § 103. Put simply, Zaccari did not develop the legal argument necessary to even gesture at the possibility that the Updated Software could be classified as a derivative work in the proceedings below. Even going so far as to consider that he alleged that the Updated Software was derivative of the Initial Software in *Zaccari I*, he appears to have raised that point in a wholly different context—to assert that Apprio had created derivative works of the Updated Software without his permission. Seeing no "exceptional circumstances" that warrant consideration of this argument, it will not be considered because the District Court did not have

an opportunity to pass on the issue with the benefit of the factual record before it. *Air Florida, Inc.*, 750 F.2d at 1084.

Zaccari's contentions that he should have prevailed on summary judgment because a number of contractual terms were ambiguous meet the same fate. For the same reasons described above, the Court cannot consider this argument. There are zero references to "ambiguities" or "*contra proferentem*"[1] in the record before us. While Zaccari did cite to caselaw in his opposition to partial summary judgment that addresses how contractual ambiguities should be resolved, he presented his attendant argument only in the "most skeletal way," *Gov't of Manitoba*, 923 F.3d at 179 (quoting *Schneider*, 412 F.3d at 200 n.1)—he neither interpreted those cases to support an argument about the resolution of ambiguities nor raised the doctrine of *contra proferentem.*

Zaccari's remaining contract interpretation arguments, while not forfeited, are easily dispatched as inapposite or unpersuasive. His contention that the Updated Software cannot be assigned through the Prior Inventions provision is irrelevant to any of the holdings in the District Court or the questions on appeal—the Agreement effectively assigns Zaccari's rights in the Updated Software to Apprio through the Assignment of Inventions Provision, not the Prior Inventions provision. To the degree that Zaccari is arguing that Apprio is not entitled to the assignment of rights in anything but the derivative material in the Updated Software and that the Prior Inventions provision fails to effectively license the original code from the Initial Software to Apprio, that argument is foreclosed by Zaccari's own failure to reserve his rights in the Initial Software as a

---

[1] *Contra proferentem* is "[t]he doctrine that, in the interpretation of documents, ambiguities are to be construed unfavorably to the drafter." *Contra Proferentem*, BLACK'S LAW DICTIONARY (11th ed. 2019).

separate prior invention. Without such a designation, the Updated Software is for all intents and purposes a complete work that Zaccari must assign, in its totality, to Apprio.

His next argument—that the Updated Software meets the requirements laid out in the Unassigned Inventions provision for exemption from the Agreement—relies on a wild assertion that the plain text of that provision should be informed by outside sources completely unrelated to the contract. On Zaccari's read, the text of the provision should be contorted to serve public policy interests in limiting employer claims to employee intellectual property because the text is substantively similar to certain provisions in state labor statutes in California, Delaware, Illinois, Kansas, Minnesota, North Carolina, and Washington. Separate and apart from the fact that the Agreement is governed by District of Columbia law rather than the law of any of these states, this is also just not how contract interpretation works. As a general matter, "the court interprets the unambiguous terms of a contract as a matter of law." *Steuart Inv. Co. v. The Meyer Grp., Ltd.*, 61 A.3d 1227, 1239 (D.C. 2013). "[W]here a contract is 'reasonably susceptible of different constructions or interpretation,'" however, "'the meaning of the language must be evinced from extrinsic evidence on the intent of the parties.'" *Id.* (quoting *District of Columbia v. D.C. Pub. Serv. Comm'n*, 963 A.2d 1144, 1155–56 (D.C. 2009)). Zaccari does not allege that the Unassigned Inventions provision is ambiguous. We agree, so we must interpret the terms of this provision of the Agreement by themselves. Even if Zaccari had alleged the Unassigned Inventions provision was ambiguous, the interpreting court would be limited to considering "extrinsic evidence" like "the conduct and prior dealings of the parties, the circumstances surrounding the making of the contract, and industry standards" that actually gets at the intent of the parties—not a small smattering of state statutes with similar language that had

no bearing on the parties' intentions with respect to the contract. *Id.*

Zaccari makes a final passing allegation that the District Court erred in finding that the Agreement was retroactively applicable, urging instead that the earliest effective date of the Agreement would have been the date of his "acknowledgment" if the facts are construed in the light most favorable to him. The Agreement, however, renders this objection null, as it unambiguously explains that the contract applies to inventions created during "[Zaccari's] Service," which the Agreement defines as "all times during [his] employment." J.A. 130.

## C.

Finally, Zaccari argues that he did not breach the Agreement and that the District Court's breach of contract analysis was flawed. This argument, however, is also forfeited.

In his briefs, Zaccari challenges the District Court's holding as to each section he breached. He first contends that he did not violate Section 1.1 of the Agreement, which prohibits public disclosures of Apprio's proprietary information, by "[p]roviding a single deposit copy of an unpublished work to the Copyright Office," Appellant's Br. 63, because the restrictions in that section are most reasonably read to prohibit "disclosures of a public nature or perhaps giving of information to commercial competitors," rather than submitting information to the Copyright Office, *id.* at 65. Zaccari next argues that his refusal to execute a "Confirmatory Assignment of Copyright" agreement ("Confirmatory Agreement") is not a violation of Section 2.8 of the Agreement, which requires the employee to "execute, verify and deliver assignments of . . . Proprietary Rights to the Company," *id.* at

63, because the Confirmatory Agreement would take away his "moral rights," which he says are not governed by the Agreement,[2] *id.* at 67. Third, Zaccari objects that he did not violate Section 7 of the Agreement, which governs the return of company documents and property upon employee termination, because he "retain[ed] documents and materials already owned and possessed by [himself]" and did not "breach any obligation to '[return]' them" under the Agreement. *Id.* at 63.

As in the case of the forfeited arguments described in the previous section, we need not consider Zaccari's breach of contract arguments at all because they were "not asserted at the District Court level." *Huron*, 809 F.3d at 1280 (quoting *Air Florida, Inc.*, 750 F.2d at 1084). He did not meaningfully dispute that he had breached Sections 1.1, 2.8 and 7 of the Agreement in any of his briefs. Instead, he dedicated his entire opposition to summary judgment below to his statute of frauds argument. His defense against the breach of contract allegations is composed of one conclusory statement: "In the absence of a binding contract . . . there can be . . . no[] breach by" Zaccari. J.A. 1516. Because Zaccari failed to assert these arguments in the District Court, they are forfeited.

---

[2] Moral rights, in countries that recognize such rights, are distinguished from copyrights and may include "a right of divulgation (that is, the right to control the first public distribution)[;]" "a right of attribution (the right to receive credit for the work)[;]" "a right of integrity (the right to object to alterations in the work which will damage the author's honor and reputation)[;]" and "a right to withdraw the work from circulation." MARY LAFRANCE, COPYRIGHT LAW IN A NUTSHELL 195 (2d ed. 2011); *see also* MELVILLE B. NIMMER & DAVID NIMMER, 3 NIMMER ON COPYRIGHT §§ 8D.01[A] (Matthew Bender rev. ed. 2023).

23

    \*    \*    \*    \*    \*

For the foregoing reasons, we affirm the judgments of the District Court.

*So ordered.*